**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5686

GEORGE GLYMPH, d/b/a
Specifications and Standards, Inc.,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Dennis W. Shedd, District Judge.
(CR-94-776)

Argued: May 9, 1996

Decided: September 19, 1996

Before RUSSELL, ERVIN, and WILKINS, Circuit Judges.

_____

Affirmed by published opinion. Judge Ervin wrote the opinion, in
which Judge Russell and Judge Wilkins joined.

_____

**COUNSEL**

**ARGUED:** James Hanjo Lengel, Columbia, South Carolina, for
Appellant. Eric William Ruschky, Assistant United States Attorney,
Columbia, South Carolina, for Appellee. **ON BRIEF:** Jonathan
Harvey, Columbia, South Carolina, for Appellant. Margaret B. Sey-
mour, United States Attorney, Columbia, South Carolina, for Appel-
lee.

_____

**OPINION**

ERVIN, Circuit Judge:

George Glymph was convicted of knowingly supplying to the Department of Defense (DOD) parts that did not conform to the purchase order specifications, in violation of 18 U.S.C. § 287. Glymph argues that his criminal prosecution was barred by his earlier four-year debarment from government contracting, which he contends constituted "punishment" for Double Jeopardy purposes. Glymph also contends that the government failed to prove his specific intent to violate Section 287. Finally, Glymph complains that the district court clearly erred when it found that he occupied a position of trust as defined by the Sentencing Guidelines. Finding no merit in his arguments, we affirm.

I.

George Glymph was President and ninety-five percent owner of Specifications and Standards, Inc. ("S&S")--an award-winning and profitable small business in Columbia, South Carolina--which bid on government purchase orders for hose assemblies and other parts. In November 1992, S&S received approval, based on its good quality history, to participate in the DOD's "Alternate Release Procedure," which allowed the company to ship parts without prior inspection by a government Quality Assurance Representative ("QAR"). Under the procedure, Glymph certified that each shipment had passed all required tests and examinations and conformed to the contractual specifications. S&S was expelled from the Alternate Release Procedure program in March 1993, after failing to respond to DOD requests for records documenting that it had delivered supplies meeting the purchase order requirements. In April 1994, debarment proceedings were instituted. No fine was imposed, but Glymph and S&S were excluded from government contracting and subcontracting for four years.

In October 1994, Glymph was indicted by a federal grand jury. The case went to trial March 27, 1995, and the jury returned guilty verdicts on seven counts of making false claims in connection with thirteen separate government purchase orders in which the parts supplied

did not conform to the specifications. 18 U.S.C.§ 287. The district court imposed a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, based on evidence that Glymph set fire to certain S&S government contract files after the DOD began an investigation. The court also enhanced Glymph's offense level under U.S.S.G. § 3B1.3 for abusing a position of trust. Glymph was sentenced on each count to twenty-one months in prison with two years' supervised release, all sentences to run concurrently, and was ordered to pay $6,891 in restitution, plus special assessments.

II.

Glymph argues that his four-year debarment from government contracting imposed "punishment" for purposes of the Double Jeopardy Clause, and therefore that his criminal conviction should be set aside. Glymph was debarred from government contracting for four years under 48 C.F.R. § 9.406-2(b), which allows for debarment or suspension in the case of

> (1) Violation of the terms of a Government contract or subcontract so serious as to justify disbarment, such as--
>
> * * *
>
> (ii) A history of failure to perform, or of unsatisfactory performance of, the terms of one or more contracts.

The reviewing official concluded that Glymph "d[id] not have the basic level of responsibility required of those who do business with the Government and that a period of debarment is appropriate to protect the Government's business interests."

Glymph's argument that administrative debarment imposes punishment is not persuasive. We agree with the Tenth Circuit's assessment of the remedial nature of debarment:

> It is the clear intent of debarment to purge government programs of corrupt influences and to prevent improper dissipa-

3

tion of public funds. Removal of persons whose participation in those programs is detrimental to public purposes is remedial by definition. While those persons may interpret debarment as punitive, and indeed feel as though they have been punished, debarment constitutes the "rough remedial justice" permissible as a prophylactic governmental action.

United States v. Bizzell, 921 F.2d 263, 265 (10th Cir. 1990) (citations omitted) (concerning debarment from HUD programs); accord United States v. Borjesson, No. 95-36140, 1996 WL 453336 at *3 (9th Cir. Aug. 13, 1996) (debarment from HUD programs); United States v. Stoller, 78 F.3d 710, 715-24 (1st Cir. 1996) (debarment from banking industry); DiCola v. Food and Drug Administration, 77 F.3d 504, 506-07 (D.C. Cir. 1996) (debarment under Food, Drug and Cosmetic Act); Bae v. Shalala, 44 F.3d 489, 492-96 (7th Cir. 1995) (debarment under the Generic Drug Enforcement Act); United States v. Hudson, 14 F.3d 536, 539-42 (10th Cir. 1994) (debarment from banking industry); United States v. Furlett, 974 F.2d 839, 844 (7th Cir. 1992) (debarment from commodities trading); Manocchio v. Kusserow, 961 F.2d 1539, 1541-42 (11th Cir. 1992) (physician's exclusion from Medicare programs).

Similarly, the Supreme Court recently held that civil forfeiture is not punitive for Double Jeopardy purposes. United States v. Ursery, 116 S. Ct. 2135, 2140 (1996). The Court first examined the forfeiture statute's stated purpose and then its actual effects to ascertain whether it served "important nonpunitive goals." Ursery's analysis defeats Glymph's argument. First, the policy statement contained in the Federal Acquisition Regulations' debarment provisions explicitly articulates its remedial, nonpunitive purposes:

(a) Agencies shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors only. Debarment and suspension are discretionary actions that, taken in accordance with this subpart, are appropriate means to effectuate this policy.

(b) The serious nature of debarment and suspension requires that these sanctions be imposed only in the public

4

interest for the Government's protection and not for pur-
poses of punishment. Agencies shall impose debarment to
protect the Government's interest and only for the causes
and in accordance with the procedures set forth in this sub-
part.

48 C.F.R. § 9.402. Here, the debarment serves the important nonpuni-
tive goals of preventing the further dissipation of public funds and
protecting DOD programs--including, potentially, protecting public
safety--by preventing the supply of substandard or defective parts.
The fact that Glymph has suffered as a result of the debarment is of
no import, for "whether a sanction constitutes punishment is not
determined from the defendant's perspective, as even remedial sanc-
tions carry the `sting of punishment.'" Department of Revenue v.
Kurth Ranch, 114 S. Ct. 1937, 1945 n. 14 (1994) (quoting United
States v. Halper, 490 U.S. 435, 447 n.7 (1989)).

We find no merit in Glymph's contention that the debarment was,
in his case, so "overwhelmingly disproportionate" to the harm caused
by his conduct that it amounts to punishment under United States v.
Halper.* Glymph complains that the four-year exclusion is over-
whelmingly disproportionate to the "small-gauge" damages he
caused. Assuming that, after Ursery, the Halper case-specific balanc-

_____

*Glymph emphasizes that he was debarred for four years, in apparent
violation of the three-year maximum debarment period established in the
regulations. See 48 C.F.R. § 9.406-4 (providing that "generally, debar-
ment should not exceed 3 years" except where an extension is necessary
based on new facts or circumstances). It is not clear whether Glymph
argues that the four-year sanction is inherently excessively long, and
therefore punitive, or whether he argues that the one-year period exceed-
ing the statutory maximum constitutes evidence of the debarring offi-
cial's punitive intent. Although the record does not reveal why Glymph
was given an extra year, the violation of the regulation does not rise to
constitutional significance. We find that a four-year debarment is not
inherently excessively long. Further, we find that, although the unex-
plained extra penalty could be viewed as evidence of an intent to punish
particularly egregious conduct, it can as easily be viewed as evidence of
an intent to protect the government from particularly egregious conduct.
We find no evidence that the extra year altered the debarment's remedial
nature.

5

ing approach applies to a case outside the fixed penalty context, see Borjesson, 1996 WL 453336 at *2 (noting that the Supreme Court "has declined to apply Halper's balancing test outside the fixed-penalty context"), we do not agree that Glymph caused "small-gauge" damage. The Government estimated that it paid S&S more than $40,000 for nonconforming parts. Taking Glymph out of the game for four years is certainly not "overwhelmingly disproportionate" to that harm.

III.

Glymph contends that there was insufficient evidence to establish his knowledge that the parts supplied did not conform to the purchase order requirements--the requisite specific intent to violate § 287. He does not offer, however, any support for that contention, other than to assert, in essence, that the jury should have viewed the evidence his way. He argues first that, because he and S&S received awards and special recognition, and because he was formerly a law enforcement officer, any wrongdoing must have been aberrant. Second, he argues that the jury should have concluded that S&S Vice President Dennis McLean was the true wrongdoer. Third, Glymph claims that the company's success overwhelmed him and caused him to allow quality control to get out of hand--mere negligence undeserving of a jail sentence. Finally, he contends that the jury became confused and treated Glymph and S&S as one legal entity.

All of those arguments add up to little more than wishing that the jury had believed him. Viewing the case in the light most favorable to the Government, United States v. Brewer, 1 F.3d 1430, 1437 (4th Cir. 1993), we find plentiful evidence of Glymph's knowledge. The jury heard evidence that S&S was a small company, and that Glymph was actively involved in all aspects of the business, especially in ordering parts to fill government purchase orders. Under the quality control manual, Glymph bore the responsibility for inspecting the parts.

On each invoice submitted to the DOD, Glymph signed a statement attesting that

> The supplies comprising this shipment have been subjected to and have passed all examinations and tests required by

6

the contract, were shipped in accordance with authorized shipping instructions, and conform to the quality, identity and condition called for in contractual requirements and to the quantity shown on this document.

Yet, testimony at trial indicated that all nonconforming parts should have been caught by Glymph when they were received. In fact, the evidence showed that in some cases a superficial inspection would quickly have revealed that parts did not conform to the government's order. For example, Count Eight involved a purchase order for high pressure fuel lines from an identified source. The parts received by the government had threading on the inside of the hose assemblies, rather than on the outside as ordered, and were manufactured by a different source. Because a jury reasonably could have found that an inspection would have revealed the disparity, it reasonably could have found that Glymph knew or purposely avoided knowing that the parts had the wrong type of threading. Count Nine provides a similar example. It involved a purchase order for three-inch hose clamps, based on a bid of $8.00 per clamp. After S&S submitted the $8.00 per clamp bid, Glymph placed an order with the supplier for three-eighths-inch clamps, which cost twenty-two cents each. The clamps received by the government thus had a much smaller diameter than that specified in the purchase order. Again, inspection would have shown that those parts did not conform to the government's order.

On some counts, there was direct evidence of Glymph's knowledge. Counts Six and Seven involved a purchase order for stainless-steel tube caps used in submarines. The S&S bid and subsequent shipment were made of carbon steel. Dennis McLean testified that Glymph placed the order for the carbon-steel (rather than stainless-steel) parts. McLean testified

> Mr. Glymph told me I'm going to package [the carbon steel shipment] and ship it back just the way it is. If they catch it and they call me back and ask me about making it stainless steel, then I will do it. . . . I run S&S; You run Transax. I'm going to send them back.

Count Twelve involved an order for GE Alco poppet valves. Martha Smith, the S&S employee who submitted the bid, testified that

7

Glymph instructed her to obtain quotes from Striegle Supply, Inc., an unauthorized dealer that sold nongenuine GE Alco Parts. Smith testified that, when she expressed concern, Glymph responded that they had not been caught yet, that they were not the only ones doing it, and that "he was the owner of the company and that he would run his company the way he wanted to run it." Smith further testified that Glymph instructed her not to disclose the disparity to Ray Bartee, the QAR.

We have carefully reviewed the evidence supporting each count of conviction, and find that the jury reasonably could have concluded beyond a reasonable doubt that Glymph knew, or purposely avoided knowing, that the parts did not conform to the contractual obligations. Further, there is no evidence that the jury was confused and unable to distinguish between Glymph and S&S. Their verdicts of acquittal on six counts demonstrate that they paid attention to quality of evidence on each charge.

IV.

Finally, Glymph argues that he did not occupy a position of trust with regard to the DOD, justifying an enhancement of his sentence. As merely an arms-length contractual partner in the ordinary course of business, he argues, he had no special duty to the United States.

Whether a defendant occupied a position of trust warranting a two-level enhancement under U.S.S.G. § 3B1.3 is a factual determination reviewable for clear error. United States v. Helton, 953 F.2d 867, 869 (4th Cir. 1992). Section 3B1.3, "Abuse of Position of Trust or Use of Special Skill," provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. . . .

U.S.S.G. § 3B1.3. The commentary explains that

8

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion. . . . For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense. . . . This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk . . . .

U.S.S.G. § 3B1.3, comment note 1. We have identified several factors that courts should consider in determining whether a defendant held a position of trust:

First, courts ask whether the defendant had special duties or "special access to information not available to other employees." Second, the defendant's level of supervision or "degree of managerial discretion" is relevant. Bank tellers who embezzle from their employers provide an example of a situation where there is little trust to abuse because the employees are closely supervised, and it is expected that wrongs they commit will be readily detected. Third, the analysis also entails an examination of "the acts committed to determine whether this defendant is `more culpable' than others who hold similar positions and who may commit crimes."

United States v. Gordon, 61 F.3d 263, 269 (4th Cir. 1995) (citations omitted). Whether a defendant held a position of trust must be "approached from the perspective of the victim." Id. The district court applied the factors listed in Gordon, and found that Glymph occupied a position of trust. (J.A. at 756-71). The court focused on the self-certification process--the "Alternate Release Procedure"--whereby the Government allowed the company to certify its own compliance. Glymph was allowed to look at the documents and the product side-by-side, and certify that they matched up. No one else was authorized to certify the shipments under the procedure. There was no point in

9

the process at which another government inspector looked at the documents and products together to double-check Glymph's certification. Thus, after Glymph's certification, parts were shipped to supply depots, and the documentation went to Indiana. Those who received the goods would not necessarily know that the shipments did not comply with the orders. And some of the product disparities would not be noticed until they were actually put into use. For example, Count Eleven charged that S&S delivered hose assemblies built with commercial-grade hose rather than the military specification hose called for in the purchase order. The two grades of hose differ only in their temperature of operation.

Glymph's reliance on United States v. Broderson, 67 F.3d 452 (2nd Cir. 1995), is misplaced. Broderson was convicted of "executing a major fraud scheme in connection with the defective pricing of a government contract," wire fraud, and "making false statements to the United States." Id. at 455. The Second Circuit held that Broderson's duty to disclose cost and pricing data to NASA stemmed solely from the Truth in Negotiation Act and the Federal Acquisition Regulations. Id. at 455-56. The agency had not entrusted Broderson with any special discretion. Id. at 456. Thus, Broderson was no more in a "position of trust" than is any taxpayer who files false returns. Id. at 455-56.

Broderson is easily distinguishable from this case. Here, Glymph benefitted from participating in a program under which it was found worthy of being trusted to self-certify its compliance. The DOD delegated the responsibility of performing inspections on its behalf to ensure that the parts conformed to the requirements in the purchase orders. The jury determined that Glymph abused that privilege to his profit, sending nonconforming shipments while knowing that it was unlikely that the disparities would be caught. The determination by the district court that Glymph occupied a position of trust with respect to the government was not clearly erroneous.

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

10