**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                No. 95-5987

SHIRLEY MACKEY,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CR-95-301-A)

Argued: March 7, 1997

Decided: May 28, 1997

Before MURNAGHAN and LUTTIG, Circuit Judges, and
BLACK, Senior United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Black wrote the opin-
ion, in which Judge Murnaghan and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Joseph N. Bowman, Alexandria, Virginia, for Appellant.
Kathleen Marie Kahoe, Assistant United States Attorney, OFFICE OF
THE UNITED STATES ATTORNEY, Alexandria, Virginia, for
Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Vir-
ginia, for Appellee.

**OPINION**

BLACK, Senior District Judge:

Following a jury trial, Shirley Mackey was convicted of sixty-two counts of wire fraud, in violation of 18 U.S.C.§§ 1343 & 2, and one count of conspiracy, in violation of 18 U.S.C. § 371. Mackey appeals these convictions, arguing that she was denied a fair trial when the district court allowed two jurors to remain after jury deliberations were suspended for the evening to perform research on the evidence in order to summarize it for all of the jurors. Mackey also contends that the district court clearly erred when it found that she occupied a position of trust as provided for in the Sentencing Guidelines. Finding no merit in her arguments, we affirm.

I.

On May 30, 1995, the director of security operations for Woodward and Lothrop Department Stores discovered that fraudulent return of merchandise credits totaling approximately $40,000 had been issued to credit cards during the period from December 1994 through May 1995. His investigation led him to believe that the perpetrators of the fraud were Shirley Mackey and Paula Williams, two employees from the Sales Audit Department of Woodward and Lothrop's corporate headquarters in Alexandria, Virginia. Mackey's computer authorization code had been used on all but one of the fraudulent transactions.

On June 1, 1995, Mackey was interviewed by two Secret Service agents, at which time she admitted that, during her employment as a group leader in the Sales Audit Department, she had entered unauthorized credits for non-existent returns of merchandise into the Woodward and Lothrop computer on at least five occasions for her daughter, and for Williams's mother and brother. Mackey also admitted to giving her computer authorization number to Williams so that Williams could execute fraudulent credits on her own computer.

Williams pled guilty in August 1995, and subsequently testified at Mackey's trial that Mackey had offered to enter credits for Williams

2

and her friends and relatives; that Mackey did enter such credits; and that Mackey later gave Williams the confidential computer access code that Williams used to effect other fraudulent credits. Thirteen other witnesses who had benefitted from the scheme testified at the trial to the fraudulent returned merchandise credits they had received from Mackey. In addition, hundreds of pages of documentation, including records of over 130 credit card charge transactions and of the subsequent reversals of those charges, were admitted into evidence.

In his final instructions to the jury, the trial judge stated:

> Your verdict must represent the collective judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict, in other words, must be unanimous. ... Each of you must decide the case for himself and herself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors.... Your verdict must be based solely upon the evidence received in this case. Nothing you may have seen or heard or read outside the court may be considered.

Just prior to excusing the jury to deliberate, the trial judge informed the jury that they could take a lunch break, but cautioned: "I just ask that when you go on your lunch break, if two or three of you go off together, that you not discuss the case; you wait until all twelve of you are back in the jury room, so that everyone receives the benefit of your views." The jury was excused to deliberate at approximately 11:50 a.m. on September 28, 1995.

At about 6:30 p.m., the jury sent a note to the trial judge asking the following question: "Can some jurors, but not all, stay and perform research activities on the evidence so as to present summary data to all jurors tomorrow?" Over defense counsel's objection, the trial judge decided to allow some jurors to stay. He stated to counsel that he would "let them do the research, as long as they understand it has to be a unanimous decision and they will have [to] satisfy themselves the research is accurate." The trial judge then instructed the jury as follows: "Several of you want to stay and do some research; is that right? It's okay, as long as your decision is unanimous and all of you

3

are satisfied the research is accurate, the people doing the research can furnish back-up data."

The jury was then excused for the evening. The next day, the jury began deliberating at 9:00 a.m. Approximately two hours later, they returned a verdict of guilty on sixty-three counts, and of not guilty on the remaining sixty-three counts.

At sentencing, the district court imposed a two-point enhancement for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3, and sentenced Mackey to a term of imprisonment of 30 months and to three years of supervised release.

II.

Mackey contends that district court erred in allowing some jurors to remain to perform research on the evidence after jury deliberations ended for the evening. We shall assume for purposes of discussion that this contention is correct. Mackey further asserts that this error constituted a structural error that requires automatic reversal of her conviction. We disagree with Mackey's claim of structural error, and find that the actions of the trial court are subject to harmless error analysis.

A.

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." United States v. Hasting, 461 U.S. 499, 508-09 (1983).

The Supreme Court has recognized that most errors can be harmless, Arizona v. Fulminante, 499 U.S. 279, 306 (1991), and has enumerated a wide range of constitutional errors subject to harmless error analysis, including, inter alia, improper admission of an involuntary confession, failure to instruct the jury on the presumption of inno-

4

cence, and improper denial of counsel at a preliminary hearing. 499 U.S. at 306-07. The Supreme Court has also recognized, however, that certain errors are so severe as to render a trial inherently unfair. 499 U.S. at 309-10. Examples of such "structural" errors include the total deprivation of the right to counsel at trial and the presence of a judge who is not impartial. 499 U.S. at 309-10. Structural errors cannot be harmless, since they affect "[t]he entire conduct of the trial from beginning to end," 499 U.S. at 309-10, and involve basic protections without which "`a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'" 499 U.S. at 310 (quoting Rose v. Clark, 478 U.S. 570, 577-78 (1986)). The Supreme Court has emphasized, however, that most errors are not structural. Indeed, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." Rose, 478 U.S. at 578-79.

In Sherman v. Smith, 89 F.3d 1134 (4th Cir. 1996) (en banc), cert. denied, 117 S. Ct. 765 (1997), we observed that

> [c]orrectly applied, harmless error and structural error analyses produce identical results: unfair convictions are reversed while fair convictions are affirmed. Expanding the list of structural errors, however, is not mere legal abstraction. It can also be a dangerous endeavor. There is always the risk that a sometimes-harmless error will be classified as structural, thus resulting in the reversal of criminal convictions obtained pursuant to a fair trial. Given this risk, judges should be wary of prescribing new errors requiring automatic reversal. Indeed, before a court adds a new error to the list of structural errors (and thereby requires the reversal of every criminal conviction in which the error occurs), the court must be certain that the error's presence would render every such trial unfair.

89 F.3d at 1138 (emphasis in original). Applying this standard, we held that a juror's unsupervised visit to the crime scene did not constitute structural error. Id. at 1137-40. We reasoned that an unsupervised juror site visit cannot be compared to the sorts of errors that require

5

automatic reversal of an otherwise valid conviction:"Unlike the complete denial of counsel and other structural errors, which affect the `entire conduct of the trial from beginning to end,' juror site visits can be discrete moments in the course of an otherwise fair trial." Id. at 1138 (quoting Fulminante, 499 U.S. at 309-10). In addition, we determined that because the Supreme Court had applied harmless error analyses to similar claims of juror misconduct and juror bias, unauthorized juror site visits do not "defy" harmless error analysis. 89 F.3d at 1138-40.

Like the error at issue in Sherman, the error at issue in the present case -- allowing some jurors to stay to perform research on the evidence in order to summarize it for all of the other jurors who had gone home for the evening -- obviously can occur in a discrete moment of an otherwise fair trial. Moreover, this error appears to be less severe than other instructional errors that the Supreme Court has subjected to harmless error analysis. For example, in Rose v. Clark, 478 U.S. 570, 582 (1986), the Court held that harmless error analysis applied to an erroneous malice instruction that all homicides are presumed to be malicious in the absence of evidence that would rebut this implied presumption. Further, in at least one respect, the error at issue in this case is significantly less severe than the one we found to be harmless in Sherman; while the error in Sherman created a possibility that the defendant's conviction was based partially on external evidence not presented during the trial, no such possibility exists here. For all of the foregoing reasons, we conclude that the issue here is "amenable to the traditional tools of harmless error analysis." Sherman, 89 F.3d at 1140.

B.

In Chapman v. California, 386 U.S. 18, 24 (1967), the Supreme Court established a standard for determining whether a federal constitutional error is harmless: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Since Chapman, the Court "has repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Van Arsdall, 475 U.S. at 681. In other words, the

6

reviewing court must ask whether, in light of the error identified by the court, it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." Hasting , 461 U.S. at 510-11.

Applying these principles to the present case, we find that the trial court's error was harmless. First, we note that the evidence summarized by the jurors who stayed was properly admitted during the trial. Thus, this case is not one involving consideration of extraneous evidence.

Second, the district court's instructions clearly directed the jury not to deliberate unless all jurors were present. During its general instructions, the trial court informed the jury that each juror must decide the case for himself or herself; it further instructed the jurors not to discuss the case in groups of two or three during their lunch break, but rather to wait until all twelve jurors were together so that all jurors would receive the benefit of each juror's views. In addition, after receiving the jury note at issue here, the judge advised the jury that its decision would have to be unanimous and that all jurors would have to satisfy themselves that the summaries were accurate. Taken together, these instructions provided adequate guidance for the two remaining jurors to know that they should not deliberate on the merits of the case. Indeed, there is no evidence that the remaining jurors failed to comply with these instructions. We therefore have no valid basis for concluding that defendant's right to a jury trial was impaired.

Third, the state offered ample evidence at trial to support the jury's conclusion that Mackey had committed conspiracy and multiple acts of wire fraud. Mackey confessed during an interview conducted by Secret Service agents that she entered unauthorized credits on at least five occasions, and that she gave her computer authorization number to Williams, her co-conspirator. Williams's testimony at trial -- that Mackey entered credits for Williams and her friends and relatives, and gave Williams the confidential computer access code -- was consistent with these admissions. At trial, Mackey further admitted that she conducted fraudulent returned merchandise credits for her friend Bonnie Stokely. These fraudulent credits were confirmed by Stokely, who also testified at Mackey's trial. In all, the government produced thirteen witnesses who testified that they received fraudulent returned

7

merchandise credits from Mackey. This powerful testimonial evidence was buttressed by the admission of numerous documents that chronicled the relevant credit card charges and the subsequent reversals of those charges.

In light of the whole record in this case, including the extensive evidence presented at trial, we find that any error by the trial judge was harmless beyond a reasonable doubt.

III.

Mackey also argues that she did not occupy a position of trust warranting a two-level enhancement under section 3B1.3 of the Sentencing Guidelines, "Abuse of Position of Trust or Use of Special Skill," which provides, in pertinent part, that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3.

While the Guidelines do not define "position of trust," the commentary to section 3B1.3 explains that

> "[p]ublic or private trust" refers to a position of public or private trust characterized by professional or managerial discretion.... For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense.... This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk....

U.S.S.G. § 3B1.3, comment note 1. We have enumerated several factors that must be considered in determining whether a defendant held a position of trust:

8

> First, courts ask whether the defendant had special duties or "special access to information not available to other employees." Second, the defendant's level of supervision or "degree of managerial discretion" is relevant. Bank tellers who embezzle from their employers provide an example of a situation where there is little trust to abuse because the employees are closely supervised, and it is expected that wrongs they commit will be readily detected. Third, the analysis also entails an examination of "the acts committed to determine whether this defendant is `more culpable' than others" who hold similar positions and who may commit crimes.

United States v. Gordon, 61 F.3d 263, 269 (4th Cir. 1995) (internal citations omitted). "Whether a defendant held a position of trust must be `approached from the perspective of the victim.'" United States v. Glymph, 96 F.3d 722, 727 (4th Cir. 1996) (quoting Gordon, 61 F.3d at 269).

The district court found that Mackey occupied a position of trust. The court focused on Mackey's possession of the computer access code, determining that this facilitated concealment of the fraudulent conduct and endowed her with information that was unavailable to others. Thus, the court concluded that Mackey did not fit within the "bank teller" exception. The district court's ruling in this regard "is a factual determination reviewable for clear error." Glymph, 96 F.3d at 727 (citing United States v. Helton, 953 F.2d 867, 869 (4th Cir. 1992)).

Mackey relies on Helton, 953 F.2d 867, in arguing that her work was functionally equivalent to that of an ordinary bank teller. This reliance is misplaced. In Helton, the district court found that the defendant, an imprest fund cashier, had no special access and that the embezzled "funds could just as easily have been picked off by another person." Id. at 870. We upheld this finding as not clearly erroneous. Id.

Helton is easily distinguishable from the present case. Here, Mackey had been a group leader in the Sales Audit Department of Woodward and Lothrop for ten years. She was one of two group lead-

ers in this department, and was responsible for supervising other auditors. In this capacity, she was authorized to possess and utilize a computer authorization code, which gave her special access to the company's data base, and enabled her to commit the fraud and conceal it from detection. The employees she supervised, including Williams, did not have access to this code. Under these circumstances, the district court's determination that Mackey occupied a position of trust was not clearly erroneous.

AFFIRMED

10