**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                     No. 97-4970

THOMAS R. FILIPPI,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(CR-97-47)

Submitted: February 9, 1999

Decided: February 23, 1999

Before LUTTIG, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

James F. Humphreys, James A. McKowen, JAMES F. HUM-
PHREYS & ASSOCIATES, L.C., Charleston, West Virginia, for
Appellant. Rebecca A. Betts, United States Attorney, Hunter P.
Smith, Jr., Assistant United States Attorney, Philip J. Combs, Assis-
tant United States Attorney, Charleston, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Thomas R. Filippi was convicted by a jury of sixty-six counts of mail fraud, see 18 U.S.C. §§ 1341, 2 (1994), one count of obstruction of justice, see 18 U.S.C.A. § 1503 (West Supp. 1998), and six counts of money laundering, see 18 U.S.C. § 1957 (1994). Filippi appeals his conviction, contesting a number of the district court's evidentiary rulings. He also appeals his 57-month sentence, challenging the district court's determination that he abused a position of trust, see U.S. Sentencing Guidelines Manual § 3B1.3 (1997), its decision to place the mail fraud counts and the money laundering counts in separate groups, see USSG § 3D1.2, and its decision to make an obstruction of justice adjustment in each group, see USSG § 3C1.1. We affirm.

In 1994, Filippi started Creative Counseling Corporation, working out of his home. Filippi was president and treasurer of the company. Joan Upole was the only other shareholder. The company had three divisions. The first, Managed Health Services, did vocational rehabilitation counseling, primarily for the Workers' Compensation Division of the West Virginia Bureau of Employment Programs. Filippi ran this part of the company. Upole was involved with Options Counseling Associates, which offered private counseling services and generated only a small amount of income to the corporation. The third division, Creative Counseling Services, never became functional.

From June 1994 until December 20, 1994, Filippi did all the vocational rehabilitation work for the corporation. During this time, he billed 3,441 hours of work to Workers' Compensation, although a normal yearly work schedule of forty hours of work for fifty-two weeks would be 2080 hours. In November 1994, Filippi billed an average of 24.75 hours per day. In December 1994, Filippi billed an average of 39.51 hours per day. In late December 1994, Filippi hired the first of five employees who, from then on, did most of the voca-

2

tional rehabilitation work, with Filippi functioning chiefly as an administrator. He reviewed and edited the employees' case expense reports, which they faxed to him, and submitted bills to Workers' Compensation. The case expense reports detailed the hours worked, travel time, and other expenses. Filippi consistently overbilled Workers' Compensation by inflating the hours worked and travel time expended, by billing for services not performed and undocumented in the employees' case reports, and by billing more than once for services performed. The district court determined at sentencing that Filippi had been overpaid by about $200,000.[1]

During his trial, Filippi conceded that he had been overpaid and that he owed money to Workers' Compensation. He testified that he did not know how much he owed. However, between 1994 and 1996, Filippi wrote corporate checks for $14,781 in payment of a debt owed by his domestic partner; for $14,233 to pay off the balance of the mortgage on the house he shared with his partner; for $75,000 to pay for house remodeling; and for $30,145 to buy a sports car. He also transferred $65,000 to his investment account.

In April 1995, Workers' Compensation began an investigation of possible fraud. In February 1996, Filippi and the corporation received subpoenas for corporate records and meetings of the board of directors, corporate tax returns, and some claimant files. In early March 1996, Filippi and Upole met and drafted corporate minutes and resolutions which were backdated to 1994 and 1995. One resolution authorized payment of a $150,000 bonus to Filippi; another, dated July 1995, authorized a loan of $176,747 to him. Filippi told Upole that the latter resolution would "take care of taxes." Afterward, Filippi gave Upole $100 as a bonus.

Following Filippi's conviction, the probation officer calculated his guideline range by placing the mail fraud and money laundering counts in separate groups. He grouped the obstruction of justice count with the money laundering counts, and recommended adjustments for obstruction of justice in both the mail fraud group and the money laundering group.

---

[1] In 1994, Filippi was paid $164,770 by Workers' Compensation. In 1995, he was paid $381,303.

3

The probation officer recommended a base offense level of 6 for the mail fraud counts, see USSG § 2F1.1, increased to 20 by specific offense characteristics and adjustments for abuse of a position of trust and obstruction of justice. He recommended a base offense level of 17 for the money laundering counts, see USSG§ 2S1.2, increased to 22 by enhancements for knowing use of proceeds of unlawful activity, the amount of loss, and obstruction of justice. Because the obstruction of justice count carried an adjusted offense level of 16, the probation officer used the higher offense level for the money laundering counts as the offense level for that group. See USSG § 3D1.4.

The probation officer also recommended an adjustment for abuse of a position of trust in connection with the mail fraud counts. This adjustment increased the combined adjusted offense level, even though the money laundering/obstruction of justice group had a higher offense level, because the multiple count unit increase would have been lower if the offense level for the mail fraud group had been more than four levels less serious than the money laundering/obstruction of justice group. See USSG§ 3D1.4.

Under the multiple counts rules, two levels were added because there were two groups of counts and the offense level for the less serious group (the mail fraud group) was within four levels of the more serious group (the money laundering/obstruction of justice group). See USSG § 3D1.4. This calculation yielded a final offense level of 24. Because Filippi was in criminal history category I, the resulting guideline range was 51-63 months. At sentencing, the district court overruled all Filippi's objections to the presentence report and sentenced him to serve 57 months imprisonment.

I. Abuse of a Position of Trust

Whether a defendant occupied a position of trust is a factual question reviewed for clear error. See United States v. Adam, 70 F.3d 776, 782 (4th Cir. 1995). To earn the adjustment, the defendant must have "abused a position of public or private trust . .. in a manner that significantly facilitated the commission or concealment of the offense . . . ." USSG § 3B1.3. Application Note 1 of the commentary states that a position of public or private trust "is characterized by professional or managerial discretion (i.e., substantial discretionary judg-

4

ment that is ordinarily given considerable deference)." The position must have assisted the defendant, for example, "by making the detection of the offense . . . more difficult." Id. The determination is made from the perspective of the victim. See United States v. Glymph, 96 F.3d 722, 727 (4th Cir. 1996).

In Adam, this Court held that a physician who commits welfare fraud abuses a position of trust because "physicians exercise enormous discretion: their judgments with respect to necessary treatments ordinarily receive great deference and it is difficult to prove that those judgments were made for reasons other than the patients' best interests." Adam, 70 F.3d at 782. Ordinary commercial relationships, by contrast, do not constitute a trust relationship sufficient to justify an adjustment under § 3B1.3. See United States v. Moore, 29 F.3d 175, 179-80 (4th Cir. 1994).

Filippi argues that his relationship with Workers' Compensation was an ordinary commercial relationship. However, before he could receive referrals from Workers' Compensation, he had to sign a provider agreement in which he agreed to provide only medically necessary services and to bill only for services actually provided. Filippi was not supervised and Workers' Compensation trusted him to bill honestly for hours worked providing rehabilitation services. On these facts, we find that Filippi's relationship with Workers' Compensation was more than an ordinary commercial relationship. In fact, it more closely resembled that of a doctor participating in a government program. Therefore, we find that the district court did not clearly err in finding that Filippi abused a position of trust.

II. Obstruction of Justice Adjustments

Guideline section 3C1.1 provides for a two-level adjustment "[i]f a defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation . . . of the instant offense . . . ." At sentencing, Filippi contested only the obstruction of justice adjustment applied by the probation officer to the money laundering group. Defense counsel stated that "[o]ur position is that the two level enhancement should only apply to the mail fraud group." On appeal, he maintains that the adjustment should not have been made in either group. With regard to the mail fraud group,

5

the issue is reviewed for plain error only. See United States v. Olano, 507 U.S. 725, 732 (1993). For the money laundering group, the issue is reviewed for clear error because the district court made a factual determination that Filippi's attempt to obstruct the investigation extended to his money laundering activities. See United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989).

With regard to the mail fraud counts, Filippi argues that the adjustment was erroneous because he cooperated with the investigation and created the false corporate records solely so he could comply fully with the subpoena or for tax purposes. He suggests that, because he was not charged with any tax offenses, his conduct did not obstruct the investigation of the mail fraud offenses or any relevant conduct. He relies on United States v. Self, 132 F.3d 1039 (4th Cir. 1997), cert. denied, 118 S. Ct. 1573 (1998), which holds that "offense" as used in § 3C1.1 means the offense of conviction and all relevant conduct. Under Self, an adjustment is not warranted if the defendant obstructs the investigation of "an offense committed by the defendant that is neither the offense of conviction nor relevant conduct to the offense of conviction." Id. at 1043.

We find that the district court did not plainly err in making the adjustment because Filippi created the false corporate records in an effort to avoid tax consequences flowing from the mail fraud offense. Relevant conduct includes acts by the defendant which occurred "in the course of attempting to avoid detection or responsibility for [the offense of conviction]." USSG § 1B1.3(a)(1). Filippi clearly was seeking to impede the investigation into his business practices and was taking steps to minimize his exposure to criminal penalties of any kind. Having failed to report the ill-gotten gains from the mail fraud, he obviously feared prosecution for tax offenses. Although he was never charged with any tax offenses, the creation of the false corporate documents was intended to frustrate the investigation of the mail fraud, which he reasonably feared might lead to a tax prosecution.

Filippi makes a similar argument concerning the obstruction of justice adjustment to the money laundering counts. For the reasons explained above, the district court did not clearly err in finding that the adjustment also applied to the money laundering counts. Filippi's creation of the false documents was intended to obstruct not only a

6

possible tax prosecution, but the entire investigation relating to his overbilling, including his use of the illegally-acquired funds.

III. Grouping

Counts involving substantially the same harm are deemed "closely related counts" and are placed in the same group for purposes of calculating the guideline range. See USSG § 3D1.2. The district court's decision to group the mail fraud and money laundering counts separately is one involving interpretation of the guidelines and is reviewed de novo. See United States v. Toler, 901 F.2d 399, 402 (4th Cir. 1990).

Filippi asserts that the mail fraud and money laundering counts should have been grouped together under either § 3D1.2(b) or (d), or both. Section 3D1.2(b) provides that counts are closely related when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Filippi argues that Workers' Compensation was the victim of both offenses and that both offenses were part of a common scheme. However, his argument fails because society, not Workers' Compensation, was the victim of the money laundering offense. See United States v. Kunzman, 54 F.3d 1522, 1531 (10th Cir. 1995) (victim of fraud is defrauded individual, but society is victim of money laundering); accord United States v. Lombardi, 5 F.3d 568, 570 (1st Cir. 1993). Therefore, the "same victim" requirement was not met.

Section 3D1.2(d) provides that counts are closely related:

> [w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

We have held that money laundering counts may be grouped with other offenses if they are both part of an ongoing or continuous scheme. See United States v. Walker, 112 F.3d 163, 167 (4th Cir.

7

1997). In Walker, an insurance agent deposited money received from customers for annuities into his own account, then sent false documents to the customers and used some of the defrauded funds to make false interest payments. Because the defendant pled guilty to money laundering under 18 U.S.C.A. § 1956(a)(1)(A)(i) (West Supp. 1998), which forbids laundering "with the intent to promote the carrying on of [the] specified unlawful activity," we found that he had conceded that his "money laundering was part of his fraudulent scheme . . . ." Id. However, in United States v. Porter, 909 F.2d 789, 793 (4th Cir. 1990), where the defendant purchased a house with the proceeds of an illegal gambling operation and later sold it again, we held that the gambling and money laundering counts were not closely related because there was no evidence that the sale "was in any way integrated with the gambling operation or connected to any particular gambling transactions." Id.[2] Porter reasoned that, "[t]o hold otherwise would mean that every act of money laundering would be closely related to the underlying crime which produced the laundered money." Id.

Unlike the defendant in Walker, Filippi was convicted of money laundering under § 1957, which simply involves spending more than $10,000 of unlawful proceeds. He contends that he used the unlawful proceeds to further the fraudulent scheme when he remodeled the house in which he had his office, bought a sports car, hired staff and provided them with computers, printers, fax machines, and telephones.

Clearly, some of Filippi's business proceeds were legitimate and were used to carry on his legitimate business activities. However, he also withdrew a large amount of money from the corporation and used it for his personal benefit. It appears from the record that Filippi put most, if not all, of the money which was unlawfully obtained to personal uses having nothing to do with furthering either his vocational rehabilitation business or the mail fraud. Consequently, we find

_____

[2] The defendant in Porter pled guilty to money laundering pursuant to § 1956(a)(1)(B)(i), which prohibits financial transactions with proceeds of unlawful activity knowingly designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds . . . ."

8

that this case is governed by Porter rather than by Walker. We therefore find no error in the district court's decision to place the mail fraud and money laundering counts in separate groups.

IV. Admission of Filippi's 1995 Amended Tax Return

On the day of trial, defense counsel moved to exclude a copy of Filippi's 1995 amended tax return, on which he reported $164,304 in income. Of this amount, $150,000 was identified as a bonus. On his first tax return, Filippi had reported only $14,000 in income. The court denied the motion on the government's representation that the tax return would establish a motive for Filippi's creation of the false corporate documents, that is, to avoid prosecution for under-reporting income. On appeal, Filippi claims that the amended return was unduly prejudicial[3] and was irrelevant because he was not charged with any tax offenses.

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The district court has broad discretion to determine whether evidence is relevant. See United States v. Fernandez, 913 F.2d 148, 155 (4th Cir. 1990). As the government maintains, the amended return showed that Filippi was concerned that the investigation might subject him to prosecution for tax offenses, and it corroborated Upole's testimony that Filippi said the creation of the corporate resolution authorizing a non-taxable $176,747 loan to him would "take care of taxes." Even though he was not charged with tax offenses, the amended return was relevant because it showed that Filippi's motive for creating the false corporate documents was to obstruct the pending investigation.

Relevant evidence may be excluded if it is unduly prejudicial. See Fed. R. Evid. 403. However, evidence is not unduly prejudicial merely because it is probative, see United States v. Queen, 132 F.3d 991, 999 (4th Cir. 1997), but only if it will cause the jury to decide

_____

[3] Although the government asserts that Filippi failed to preserve the issue of prejudice, defense counsel preserved the issue by arguing that the amended return was prejudicial.

the case on emotion rather than reason. Id. The amended tax return was not evidence of this kind. Therefore, the district court did not abuse its discretion in permitting the government to introduce it.

V. Other Evidentiary Rulings

Before trial, the government moved to exclude from evidence four letters Filippi had written to Workers' Compensation between February and July 1995 complaining of delays in payment and of confusion in the billing process. The district court ruled initially that the letters could not be mentioned in opening arguments. Later, the court permitted Filippi to introduce any letters he sent to Workers' Compensation before May 1995, when Filippi testified that he learned that he and his corporation were under investigation. The court required redaction of hearsay in the letters about advice that personnel at Workers' Compensation allegedly gave to Filippi concerning his billings. Ultimately, Filippi offered two letters, one written in February 1995, the second written in April 1995. The district court's evidentiary rulings are reviewed for abuse of discretion. See United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995).

Filippi first argues that the district court erred in granting the government's motion in limine to prohibit mention of the letters in opening statements. He offers no authority to support his position. Generally, opening statements should avoid references to evidence of doubtful admissibility because such statements may, if the evidence is not admitted, trigger a mistrial. See United States v. Sloan, 36 F.3d 386, 397-99 (4th Cir. 1994) (defense opening statement); United States v. Brockington, 849 F.2d 872, 874-75 (4th Cir. 1988) (prosecutor's opening statement). Because the district court had not yet ruled on the admissibility of the letters Filippi sought to introduce, it did not abuse its discretion in prohibiting reference to the letters in opening statements.

Filippi also contends that the requirement to redact hearsay from the letters was an abuse of discretion because hearsay is admissible when it occurs in regular business records. Again, he has no authority for his position. While regular business records fall within a recognized exception to the hearsay rule, see Fed. R. Evid. 803(6) (records of regularly conducted activity), Rule 805 requires that hearsay within

10

hearsay is admissible only if it also comes within an exception to the hearsay rule. See Precision Piping v. E.I. du Pont de Nemours, 951 F.2d 613, 619 (4th Cir. 1991); United States v. Portsmouth Paving Corp., 694 F.2d 312, 321 (4th Cir. 1982).

The hearsay Filippi sought to introduce consisted of advice about his billing which he alleged certain employees of Workers' Compensation had given him, i.e., that he should resubmit bills which were not paid promptly and that he should change the date of the services rendered so as not to confuse the computers at Workers' Compensation. None of the employees who allegedly gave him this advice were called as witnesses, and the statements they allegedly made did not come within any hearsay exception. Consequently, the district court did not abuse its discretion in requiring redaction of these hearsay statements from the letters admitted into evidence.

Third, Filippi argues that the court abused its discretion in excluding those letters he wrote after he learned that he was being investigated because all four letters should have been admissible as business records. However, business records may be excluded if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(6). Business documents prepared with litigation in mind are not admissible because litigation is not a regularly conducted business activity and because there may be an obvious motive to misrepresent. See AMPAT/Midwest v. Illinois Tool Works, 896 F.2d 1035, 1045 (7th Cir. 1990); cf. United States v. Frazier, 53 F.3d 1105, 1110 (10th Cir. 1995) (regular audit prepared by neutral third party deemed trustworthy and admissible). Here, Filippi's letters to Workers' Compensation were not a regular activity of his business and he had a clear motive to use them to create an exculpatory explanation of his billing practices. Consequently, this case is distinguishable from United States v. Baxter, 492 F.2d 150, 165 (9th Cir. 1973) (drug dealer's business records admissible even after he became informant), on which Filippi relies. The district court did not abuse its discretion in excluding the letters written after Filippi became aware of the investigation.

Finally, in a claim submitted pursuant to Anders v. California, 386 U.S. 738 (1967), Filippi asserts that the district court abused its discretion in allowing West Virginia State Trooper Bennett to compare

11

the hours Filippi worked, as recorded on his case expense reports, with the hours he billed to Workers' Compensation, as shown on the Workers' Compensation computer printouts, because the two were "apples and oranges," and the evidence was "not based on fact." Defense counsel argued that the billing printouts covered an entire reporting period (about twenty-one days), rather than just the date shown on the printout, while the case expense reports showed work done on a specific day. However, Bennett testified about the hours reflected on all the case expense reports pertaining to each client for the whole period covered in the billing printout, as well as the hours billed for each client during the period. We find that the testimony was not misleading, lacking in foundation, irrelevant, or unduly prejudicial.

For the reasons discussed, we affirm the conviction and the sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

12