The UNITED STATES of America

v.

Earl Edwin PITTS, Defendant.

No. 1:96cr0483.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 30, 1997.

Helen F. Fahey, U.S. Atty., Randy I. Bellows, Asst. U.S. Atty., Alexandria, VA for Plaintiff.

Nina J. Ginsberg, Dimuro, Ginsberg & Lieberman, P.C., Alexandria, VA, Frank W. Dunham, Jr., Cohen, Gettings, Dunham & Davis, Arlington, VA, for Defendant.

### SENTENCING MEMORANDUM

ELLIS, District Judge.

#### Introduction

Defendant Earl Edwin Pitts ("Pitts") came before the Court for sentencing after entering a plea of guilty on February 28, 1997, to Counts 1 and 3 of a 12–Count indictment.[1]

---

1. On the government's motion, the remaining 10    counts of the indictment, which charged attempt-

Specifically, Pitts pled guilty to conspiring to commit espionage, in violation of 18 U.S.C. § 794(a) and (c) (Count 1), and attempting to commit espionage, in violation of 18 U.S.C. § 794(a) (Count 3). Pursuant to 18 U.S.C. § 3553, the Court stated its findings and reasons from the bench for the sentence imposed. This Sentencing Memorandum elaborates on those findings and reasons.

The record reflects that Pitts, a United States citizen, joined the Federal Bureau of Investigation ("FBI") as a Special Agent on September 18, 1983. Upon graduation from the FBI Academy, Pitts was assigned to the FBI Field Office in Alexandria, Virginia, where he worked on white collar crime and narcotics investigations. In March 1985, the FBI relocated Pitts to Fredericksburg, where he worked as the Resident Agent for the Northern Neck region of Virginia. After less than two years as a Resident Agent, the FBI transferred Pitts to the New York Field Office to work as a member of a foreign counterintelligence ("FCI") squad. As an FCI squad member, Pitts' duties included investigating officers of the Committee for State Security, Komitet Gosudarstvennoy Bezopasnosty ("KGB"), the intelligence service for the then-existing Union of Soviet Socialist Republics ("U.S.S.R."), assigned to the U.S.S.R. Mission to the United Nations. In this position, Pitts had access to a wide range of sensitive, classified, and top secret material concerning, among other things, counterintelligence operations, surveillance of U.S.S.R. Mission officials, and the true identities of human assets and defectors, namely, American and Soviet agents.

While working in New York, Pitts betrayed his country by becoming an agent of the KGB. Specifically, in July 1987, Pitts sent a letter to a Soviet official employed by the U.S.S.R. Mission to the United Nations requesting a meeting with a representative of the KGB at the New York Public Library. The letter suggested that Pitts could provide the KBG with valuable U.S. security information. To establish his *bona fides* as a source of such information, Pitts' letter enclosed certain secret surveillance information pertaining to the Soviet official's recent activities. The Soviet official, who was not, as Pitts thought, a KGB officer, forwarded Pitts' message to the U.S.S.R. Mission's Chief Security Officer, who instructed the official to meet Pitts at the New York 2 Public Library and to introduce Pitts to Aleksandr Karpov, the KGB officer at the U.S.S.R. Mission responsible for penetrating the United States' intelligence and security services. The Soviet official complied, and Pitts' counter-espionage activity commenced.

Between July 1987 and October 1992, Pitts actively engaged in espionage on behalf of the KGB and, subsequently, the Sluzhba Vneshney Rasvedi Rossii ("SVRR"), the KGB's successor organization.[2] During this period of time, Pitts held a number of sensitive positions within the FBI [3] and had access to top secret documents. After Pitts moved from New York City to the Washington, D.C. metropolitan area in August 1989, he made at least 9 brief trips to New York to pass unclassified and classified material to his KGB and SVRR "handlers." [4] In exchange

ed espionage, communication of classified information without authority, bribery, and conveyance without authority of property of the United States, were dismissed.

**2.** In 1991, the SVRR succeeded the KGB when the Russian Federation succeeded the Soviet Union.

**3.** Following a one year stint in FCI, Pitts was promoted to Supervisory Special Agent in August 1989 and assigned to the Information Management Division at FBI Headquarters in Washington, D.C. Then, in January 1991, the FBI assigned Pitts to the Security Section of the Information Management Division at FBI Headquarters. Shortly thereafter, in October 1991, the FBI transferred Pitts to the Security

Countermeasures Section of the Intelligence Division at FBI Headquarters. In all of these positions, Pitts had access to highly classified material.

**4.** In addition to the classified surveillance information pertaining to the Soviet official that Pitts had disclosed in his letter of July 1987, Pitts conveyed to the KGB a classified document known as the "Soviet Administration List." This secret register contained, among other things, the names, postings, and known or suspected intelligence affiliation of each Soviet official assigned to the United States. Beyond this, the record does not reflect precisely what information Pitts provided to his KGB and SVRR handlers during the 1987–1992 period. Thus, the government has not established, and does not

for this U.S. national security information, the KGB and SVRR paid him substantial sums of money. The record confirms that Pitts received at least $129,000 for the U.S. national security information he provided to the KGB and SVRR and was promised an additional $100,000. In an effort to conceal these funds and their source, Pitts laundered his ill-gotten proceeds by making hundreds of small cash and money order deposits into various personal bank accounts. In this regard, for example, Pitts made 20 or more such deposits in a single month.

In October 1992, Pitts was transferred to the Legal Counsel Division at FBI Headquarters. At this time, Pitts ceased to engage in active espionage on behalf of Russia: he went "dormant," as they say colloquially in the field. Approximately three years passed with Pitts in this idle mode. Then, in January 1995, Pitts began to work in the Behavioral Science Unit at the FBI Academy in Quantico, Virginia. At no time did Pitts disclose to the FBI his 1987–1992 espionage activities on behalf of the KGB and SVRR.

Sometime in 1995, unbeknownst to Pitts, the Soviet official whom he had initially contacted by letter in 1987 had begun to cooperate with the FBI. In the course of this cooperation, this official disclosed to FBI personnel Pitts' prior espionage activities on behalf of the KGB and SVRR. Armed with this information, the FBI launched project "False Flag," a counterintelligence operation designed to persuade Pitts that the SVRR had reactivated him. Through "False Flag," the FBI hoped to gather information concerning Pitts' espionage activities during the 1987–1992 period.

The "False Flag" sting commenced when the FBI mailed a letter to Pitts, postmarked New York, New York. This letter purported to reactivate him as a spy for the SVRR. Pitts did not respond. The FBI then instructed the former Soviet official to approach Pitts. So, on August 26, 1995, the Russian informant contacted Pitts at his residence in Northern Virginia, requesting that he immediately meet a "guest from Moscow." Pitts agreed to meet the Russian informant and the guest at the Chancellorsville Battlefield Visitor Center later that same afternoon. At this "clandestine" meeting, the Russian informant and the guest asked for Pitts' assistance and Pitts readily promised to "do what I can." [5] And so he did.

From then until his arrest in December 1996, Pitts, believing that the Russians had indeed reactivated him, engaged in a wide array of attempted espionage activities. In contrast to his prior espionage, the persons Pitts dealt with during the "False Flag" operation were actually undercover FBI agents pretending to be SVRR officers. During the 16 month period of Pitts' attempted espionage, he made 23 "drops" of unclassified and classified FBI documents and held 9 telephone conversations and 2 face-to-face meetings with his SVRR/FBI handlers. In particular, Pitts, believing that he was dealing with Russian agents, provided his handlers confidential personal information concerning approximately 250 fellow FBI special agents and numerous internal FBI directories. And, in an especially audacious plot, Pitts planned to smuggle an SVRR technician into the FBI Academy to facilitate SVRR eavesdropping on a secure FBI telephone communication system. To this end, Pitts provided his SVRR/FBI handlers with: (1) his FBI

---

contend, that Pitts passed documents classified as top secret to the KGB and SVRR during this period.

5. Apparently, Mrs. Pitts, who was not involved in, or aware of, her husband's espionage activities, became alarmed when, in 1995, a man with a foreign accent visited the house and asked to speak with her husband and her husband left in a "panic." She proceeded to search her husband's home office, finding the supposed "reactivation" letter. A few days later, Mrs. Pitts met with FBI Special Agent Tom Carter and told him about this troublesome incident and her husband's peculiar behavior. In fact, Mrs. Pitts

provided a copy of the "False Flag" letter. Pitts learned of his wife's meeting and requested one of his own with Special Agent Carter. During this meeting on August 30, 1995, Pitts lied about the event.

Worth noting here is that the record nowhere discloses whether Pitts was required to take any polygraph examinations during the 1987–1992 period or thereafter up to 1995, and if so, the results of those examinations. As part of the government's debriefing process, Pitts submitted to a two day examination, the results of which are disputed. For purposes of sentencing, however, the results are immaterial.

identification badge; (2) a key to an FBI Academy building; (3) maps and recommended routes for the SVRR technician; (4) the cipher lock combination to the room containing the secured telephone communication system; and (5) proposed dates and times for entry to the "target area." For these and other services, Pitts accepted payment of $65,000 from his SVRR/FBI handlers. On December 18, 1996, Pitts was arrested for espionage.

### A. Uncontested Matters:

With the exception of the objections listed in Section B, Pitts and the government have no objection to the Presentence Investigation Report ("PSIR"). Accordingly, with the exception of the contested matters listed below, the Court adopts the findings and conclusions of the PSIR as its findings and conclusions in this sentencing proceeding.

Further, with the consent of the parties, the Court ORDERS that the following letters and submissions be made a part of the PSIR:

1. Preliminary Report of Psychiatric Evaluation of Earl E. Pitts, by David L. Charney, M.D., received May 7, 1997.

2. Plea Agreement, dated February 27, 1997.

3. Letter to Ms. Suarez, Probation Officer, from Randy Bellows, Assistant United States Attorney, dated March 27, 1997.

4. Letter to Probation Officer Suarez from Assistant United States Attorney Bellows, dated April 22, 1997.

5. Letter to Probation Officer Suarez from Assistant United States Attorney Bellows, dated June 3, 1997.

6. Letter to Assistant United States Attorney Bellows from David L. Charney, M.D., dated May 27, 1997.

7. Letter to Probation Officer Suarez from Assistant United States Attorney Bellows, dated June 12, 1997.

8. Letter to Probation Officer Suarez from Frank W. Dunham, Jr., dated April 17, 1997.

9. Letter to Probation Officer Suarez from Nina J. Ginsberg, dated June 10, 1997.

### B. Contested Matters:

■ The parties dispute whether or not Counts 1 and 3 should be grouped pursuant to U.S.S.G. § 3D1.2(b). Pitts contends that grouping of the counts is required because the two offenses charged were part and parcel of a common plan or scheme. Specifically, Pitts argues that his subjective belief during the FBI's "False Flag" operation that he was continuing to conspire to commit espionage on behalf of the Russians is controlling and compels grouping. The government disagrees, arguing instead that there was no common plan or scheme and that Pitts' state of mind should not be dispositive of the grouping determination. This dispute is not inconsequential. Should Pitts prevail, he would face no additional imprisonment for his 16 months of attempted espionage.[6] Yet, should the government prevail, Pitts' offense level would increase by 2 levels pursuant to U.S.S.G. § 3D1.4.[7] Accordingly, "to group or not to group" is the question material to the sentencing decision.

The basic principles governing resolution of this question are well established. Chapter 3, Part D of the Guidelines provides a complex collection of rules for determining a single "combined" offense level for a defendant convicted of multiple counts. U.S.S.G.

---

**6.** This result follows from an application of U.S.S.G. §§ 3D1.2 and 3D1.3, which pertain, respectively, to "Groups of Closely Related Counts" and "Offense Level Applicable to Each Group of Closely Related Counts." The parties agree, correctly, that if grouping is applicable, then these sections would yield an offense level of 39, for a total offense level of 36 after subtraction of a 3 level credit for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. And because Pitts' criminal history falls within category I, the resulting Guidelines sentencing range would be 188 to 235 months.

**7.** This result follows from an application of the same first section, namely U.S.S.G. § 3D1.2, as well as U.S.S.G. § 3D1.4, which together yield a total offense level of 38 after subtraction of a 3 level credit for acceptance of responsibility. The resulting Guidelines sentencing range would be 235 to 293 months.

§ 3D1.1 *et. seq.* As their underlying rationale, these so-called grouping rules balance two competing objectives: The first is to guarantee "incremental punishment for significant additional criminal conduct," U.S.S.G. Ch.3, Pt. D, intro. comment; the second is "to prevent multiple punishment for substantially identical offense conduct." *Id.*[8] In other words, the grouping rules operate in multiple offense cases to effect a delicate, but practical balance in sentencing between adequate punishment and excessive punishment. Guidelines § 3D1.2, which treats the grouping of "closely related counts," sets forth four situations in which multiple counts "involving substantially the same harm" should be grouped.[9] In the case at bar, only subsection 3D1.2(b) may be applicable; a brief examination of the three other subsections discloses that none fits here. Thus, Counts 1 and 3 do not involve the "same act or transaction" for purposes of grouping pursuant to subsection 3D1.2(a); it is undisputed that Pitts engaged in numerous distinct criminal acts and transactions over the course of ten years of criminal espionage activities. Further, this case does not present the situation described in subsection 3D1.2(c) where the criminal conduct underlying one of the multiple counts embodies a specific offense characteristic of another companion count. The conspiracy to commit espionage alleged in Count 1 is not an offense characteristic of the attempted espionage alleged in Count 3. Similarly, subsection 3D1.2(d) does not apply, for it expressly excludes from grouping offenses covered by U.S.S.G. § 2M3.1, the guideline applicable to espionage charges.[10] Accordingly, the inquiry necessarily focuses on whether the offenses should be grouped together in accordance with subsection 3D1.2(b).

Subsection 3D1.2(b) requires the determination of two factors: (1) whether the offenses involved the same "victim;" and (2) whether the offenses involved multiple "acts or transactions" connected by a common criminal objective or that form part of a common scheme. The dispute here implicates only the second factor.[11] Thus, the

---

**8.** See also *United States v. Wessells,* 936 F.2d 165, 168 (4th Cir.1991) (stating that "[t]he Sentencing Commission's purpose in creating [the grouping rules] was twofold"); *United States v. Wheelwright,* 918 F.2d 226, 229–30 (1st Cir.1990) (Breyer, C.J.) (explaining that the grouping rules codified "two widely shared [pre-Guideline] intuitions about punishing a person convicted of several different counts of criminal behavior").

**9.** Section 3D1.2 provides that counts "involving substantially the same harm" should be grouped:
   (a) When counts involve the same victim and the same act or transaction.
   (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
   (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
   (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense and the offense guideline is written to cover such behavior.

**10.** Here, Pitts advances an interesting but ultimately unavailing Ex Post Facto Clause argument. In short, he contends that Counts 1 and 3 should be grouped because, prior to a 1988 Guidelines amendment, espionage was not specifically enumerated as an offense excluded from grouping pursuant to subsection 3D1.2(d). Absent ex post facto concerns, convicted criminal defendants are sentenced under the Guidelines in effect at the date of their sentencing. *See* U.S.S.G. §§ 1B1.11(a) and (b)(1). But the Ex Post Facto Clause prohibits the use of Guidelines provisions in effect at sentencing when the pertinent provisions have been changed in a manner adverse to defendant between the date of the offense and the date of sentencing. *See Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987); *United States v. Heater,* 63 F.3d 311, 332 n. 6 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 796, 133 L.Ed.2d 744 (1996). In the circumstances, there is no ex post facto violation, for the 1988 amendment merely clarified, as opposed to altered, the substance of the pertinent Guideline.

**11.** With regard to the first factor, the government does not dispute that Counts 1 and 3 harmed the same victim, namely the United States or, in Guidelines terms, the Nation's "societal interest." See Application Note 2 ("For offenses in which there are no identifiable victims (*e.g.,* drug or immigration offenses, where society at large is the victim), the 'victim' for purposes of subsections (a) and (b) is the societal interests that is harmed."). Specifically, the government concedes that Counts 1 and 3 threatened the Nation's "societal interest" in three crucial respects: (1) the protection of secret and confidential national security information; (2)

answer to the question whether Counts 1 and 3 involved substantially the same harm depends on whether Pitts' two periods of espionage activity were connected by a common criminal objective. The record points persuasively to the conclusion that they were not so connected and, hence, not amenable to grouping under subsection 3D1.2(b).

█ More specifically, the record reflects that Pitts appropriated classified and secret information from the FBI during two separate time periods—1987–1992 and 1995–1996. During the initial period, Pitts successfully transmitted intelligence information to the KGB and the SVRR and during the second period, he supplied material to FBI agents posing as SVRR officers. Thus, with the exception of the Russian informant, the persons that Pitts dealt with during the course of the "False Flag" operation were different from those he worked with during his years of active espionage on behalf of the KGB and SVRR even so, Pitts argues that these two periods of espionage were part and parcel of a common plan or scheme because he subjectively "believed" that the "False Flag" operation was a continuation of the espionage conspiracy that he had initiated in 1987. This contention is of no avail, for a defendant's subjective belief or intention that he or she committed one "composite" harm is not dispositive of the grouping determination. Were this not so, a defendant who robbed one victim on multiple occasions would also be entitled to grouping based on his or her subjective belief that the separate robberies were part of a common plan or scheme. Such a result would contradict Application Note 4, which counsels that a defendant who robs one victim on numerous occasions has not committed one composite harm.[12] Yet another example illustrative of this point is a defendant "convicted of two counts of rape for raping the same person on different days." Like the robbery example, the rapes do not group.[13] The same result should ob-

tain here for the same reason. Like the defendant who robs or rapes the same victim twice, Pitts committed two separate offenses that caused two separate quanta of harm. Thus, with respect to Count 1, he conspired with agents of a foreign power to commit espionage. And in furtherance of this conspiracy, he committed numerous acts that caused one composite harm to the United States. Count 3 is wholly separate and distinct from the Count 1 conspiracy, resulting in a second distinct composite harm. There, Pitts attempted to commit espionage by engaging in a series of acts that were not in furtherance of the Count 1 conspiracy, except in Pitts' mind. The composite harm caused by the Count 3 attempt is different and distinct from the composite harm caused by the Count 1 conspiracy. It follows that grouping Counts 1 and 3 is inappropriate. Were this not the case, Pitts would escape punishment for his separate and severable criminal conduct in connection with the "False Flag" operation.

While there is no legal authority directly on point, the result reached here finds support in analogous cases indicating that the passage of time between offenses, intervening circumstances, and the varying characteristics of the offenses in question may justify a decision not to group multiple counts. Particularly instructive here is the Fourth Circuit's decision in *United States v. Moore*, 25 F.3d 1042 (4th Cir.1994) (unpublished disposition), *cert. denied*, 514 U.S. 1102, 115 S.Ct. 1838, 131 L.Ed.2d 756 (1995). There, the defendant was convicted for both the attempted and, ultimately, successful arson of the same residence. In denying his argument that the two offenses constituted one *common plan or scheme to defraud an insurer*, the Fourth Circuit affirmed the district court's decision not to group the two charges because "[t]here were multiple, separate harms involved in the two arsons, not one

___

the ability and capacity to gather foreign intelligence information; and (3) the reliance on the trustworthiness of American intelligence and law enforcement officers.

**12.** Application Note 4 provides, in pertinent part, that: "This provision does not authorize the grouping of offenses that cannot be considered to

represent essentially one composite harm (*e.g.*, robbery of the same victim on different occasions involves multiple, separate instances of fear and risk of harm, not one composite harm)."

**13.** U.S.S.G. § 3D1.2, Application Note 4.

composite harm." *Id.*[14] Thus, much as an attempted arson and a subsequently successful arson of the same structure should not be grouped, so, too, is grouping inappropriate for two separate and distinct periods of espionage activity—one actual and one attempted.

Accordingly, the government's objection to the PSIR's recommendation that Counts 1 and 3 should be grouped is **SUSTAINED.**

■ In the alternative, even assuming, *arguendo,* that the PSIR was correct in recommending the grouping of Counts 1 and 3, then an upward departure of two levels would be warranted here to ensure appropriate additional punishment for Pitts' additional criminal conduct in connection with the FBI's "False Flag" operation.[15] On this point, the Guidelines are not silent; they explicitly provide for an upward departure

when the grouping rules operate to create "unusual circumstances." *See* U.S.S.G. § 3D1.4, Application Notes.[16] Precisely this would occur here were grouping to apply; the record leaves no doubt that the aggravating and outrageous nature of Pitts' criminal conduct during the "False Flag" operation would be inadequately accounted for by the grouping of Counts 1 and 3. This conduct includes:

> (1) plotting with persons whom he believed to be SVRR officers to smuggle a Russian technician into the FBI Academy so that the technician could gain access to a telephone used for secure, classified communications;
> (2) providing his identification badge, FBI Academy key, a cipher lock combination, and maps to the presumed SVRR officers;
> (3) stealing a handset from a secure telephone and replacing it with one that he mistakenly believed had been modified by agents of the SVRR;

14. For other informative cases on this point, see *United States v. Bonner,* 85 F.3d 522 (11th Cir. 1996) (finding that the defendant's twenty convictions for twenty threatening telephone calls to an AUSA over the course of one year should not be grouped under subsection 3D1.2(b), even though the threatening communications were arguably part of a common criminal objective, because the victim "suffered separate and distinct instances of fear and psychological harm with each separate" call); *United States v. Cousens,* 942 F.2d 800 (1st Cir.1991) (upholding the district judge's separate groupings of firearm violations because the defendant had bought the firearms on different occasions, for varying purposes, and had used funds from different sources); *United States v. Wessells,* 936 F.2d 165 (4th Cir.1991) (affirming the district judge's decision to divide twenty-two weapons counts into three groups because the passage of time between each set of offenses "demarcated them into separate courses of conduct").

15. By letter dated April 22, 1997, the government advised the Probation Office and defense counsel of its intention to seek an upward departure for the inadequacy of grouping rules should the Court group Counts 1 and 3. The PSIR also reported the government's intention in this regard. Further, by Order dated June 16, 1997, the Court notified Pitts concerning this and other possible grounds for upward departure. See *United States v. Pitts,* Civil Action No. 96–483 (Order, June 16, 1997). Thus, Pitts received reasonable notice of this contemplated departure within the meaning of Rule 32, Fed.R.Crim.P. See *Burns v. United States,* 501 U.S. 129, 138, 111 S.Ct. 2182, 2187, 115 L.Ed.2d 123 (1991)

(holding that the sentencing court must give the parties reasonable notice of a contemplated upward departure, unless the "ground for upward departure [was previously identified] either in the presentence report or in a prehearing submission by the Government").

16. The Background to the Application Notes provides, in pertinent part, that:

> In unusual circumstances, the approach adopted in this section could produce adjustments for the additional counts that are inadequate or excessive. If there are several groups and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts. Ordinarily, the court will have latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense. Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines.

For illustrative cases, see *United States v. Rowbal,* 105 F.3d 667 (9th Cir.1996) (table) (upholding a two-level upward departure on the ground that the defendant's punishment, "under the grouping rules, was increased only slightly for the loss of [a] second life"), *cert. denied,* —— U.S. ——, 117 S.Ct. 1718, 137 L.Ed.2d 841 (1997); *United States v. Infelise,* 835 F.Supp. 1466, 1496 n. 51 (N.D.Ill.1993) (holding that "significant and extensive criminal activity" not accounted for by the grouping rules constituted an additional basis for departing upward).

(4) transmitting personal and private information concerning fellow FBI agents to the phony SVRR officers; and

(5) delivering classified and internal FBI material to the "SVRR" officers in exchange for cash payments.

Although Pitts claims that he participated reluctantly in the "False Flag" operation, the record in this case flatly refutes this claim.[17] In sum, concluding that the Guidelines command the grouping of Counts 1 and 3 in this case produces the anomalous result of allowing Pitts to escape punishment for egregious criminal conduct during the "False Flag" operation that is essentially separate and distinct from his original criminal espionage conduct during the 1987–1992 period. This unusual circumstance certainly justifies, indeed compels, a two level upward departure to eliminate the anomaly that would be introduced by grouping Counts 1 and 3. So, in the event the ruling against grouping Counts 1 and 3 is reversed on appeal, the Court would reach the same offense level total by alternatively concluding that a two level upward departure is warranted.[18]

### C. *Motion for Departure:* [19]

■ A district court may impose a sentence outside the applicable guideline range where "there exists an aggravating or mitigating circumstances of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18

U.S.C. § 3553(b); U.S.S.G. § 5K2.0. This case presents precisely such circumstances. As the record reflects, Pitts' abuse of trust greatly exceeded the typical, or "heartland," espionage case.[20] Contrary to Pitts' contention, the applicable guideline for espionage offenses, U.S.S.G. § 2M3.1, does not incorporate abuse of trust, for it is entirely possible that a person could commit espionage without abusing any position of government trust. For instance, a person not employed in a position of trust might provide classified information to a foreign power after purchasing the information from someone who holds such a position. Such a person might also clandestinely snap pictures of a secret military facility and provide those to a foreign power. This is why the two level adjustment for the abuse of a position of trust applies here. *See* U.S.S.G. § 3B1.3.[21] But this adjustment is plainly inadequate in the circumstances. *See Koon v. United States,* — U.S. ——, ——, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996) (holding that a departure may be warranted when an enhancement factor "is present to a degree substantially in excess of that which ordinarily is involved in the offense" ); *see also United States v. Bailey,* 112 F.3d 758, 772 (4th Cir. 1997). Although Pitts contends that it is difficult, if not impossible, to imagine a "heartland" espionage case that does not involve abuse of trust, Pitts' abuse of trust is especially atrocious. Pitts was not only a supervisory special agent of the FBI, he was also a foreign counterintelligence operative.

---

17. The numerous videotapes of Pitts' "furtive" meetings with his SVRR/FBI handlers reflects occasional nervousness, but no reluctance. Indeed, Pitts' ready acceptance of sizeable monetary payments undercuts his claim of reluctance. Moreover, some of Pitts' "False Flag" operation activities stemmed from his suggestions.

18. Although irrelevant to the Guidelines calculations, the government also requested that the PSIR be amended to reflect that the FBI was an actual victim of Pitts' crimes. In particular, the government contends that it is appropriate in the circumstances to list the FBI as a separate victim given that Pitts specifically intended to harm the agency. Pitts opposed this request, arguing that it is unnecessary to distinguish the FBI from the nation as a whole. Because the objection is irrelevant to the application of the Guidelines, it is **OVERRULED.**

19. Pitts does not dispute that he received reasonable notice of various possible bases for upward departure, including the specific basis discussed here, pursuant to Rule 32, Fed.R.Crim.P. *See infra* note 15.

20. This Court also considered but, ultimately, declined to impose an upward enhancement based on: (1) the breadth and duration of the conspiracy; and (2) national security endangerment.

21. As § 3B1.3 explains, the two level adjustment is inapplicable where the abuse of trust or use of special skill is inherent in the base offense level or specific offense characteristic: "This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."

In fact, from 1987 to 1989, the initial years of his espionage, Pitts' job was to thwart the espionage activities of the very foreign intelligence service with which he had conspired. In contrast to other espionage cases involving military personnel, military clerks, and non-military employees,[22] Pitts held a special position of awesome responsibility and trust; he was supposed to safeguard this nation from foreign espionage activity. Instead, he betrayed his country by engaging in the very activity that he was sworn to protect the nation against. Except for the Directors of the Central Intelligence Agency and the FBI or other high governmental officials, there could be no more egregious and intolerable violation of trust and confidence. Since two levels simply cannot adequately account for Pitts' despicable abuse of trust behavior, the Court, *sua sponte*, departs upward by one level.[23]

### D. Conclusions:

1. Defendant's adjusted offense level is 39.

2. Defendant's total offense level is 39.

3. Defendant's criminal history category is I.

4. The range of punishment under the Guidelines is 262 to 327 months with at least three (3) years of supervised release.

5. The Guidelines range of fines is $20,000 to $200,000. An additional statutory special assessment of $100 applies to each felony count for a total of $200. 18 U.S.C. § 3013(a)(2)(A).

6. Probation is not authorized.

### E. Sentence Imposed:

As to Count 1, the Court commits defendant to the custody of the Bureau of Prisons for a period of 324 months. As to Count 3, the Court commits defendant to the custody of the Bureau of Prisons for a period of 324 months. The sentence imposed on Count 3 is to run concurrent with the sentence imposed on Count 1. Defendant shall be given credit for time served in connection with this case.

Upon release from confinement, defendant is to serve a period of 5 years of supervised release on each count to run concurrently with one another.

The Court imposes a $200 special assessment. 18 U.S.C. § 3013(a)(2)(A).

The Court recommends that the Bureau of Prisons designate a facility for defendant to serve his sentence where he may be close to his family.

In light of the defendant's limited assets, the Court declines to impose a punitive fine or an additional fine to cover the costs of incarceration or supervised release.

### F. Statement of Reasons for the Court's Sentence:

The sentence imposed adequately satisfies the Guidelines' goals relating to deterrence, retribution, and incapacitation. Indeed, it may be said to be lenient given the egregious nature and duration of the conduct. Absent the Guidelines, the appropriate sentence would have been life without the possibility of parole.

Pitts' various excuses, as recounted in the psychiatric report and his version of the offense, are rationalizations that can never jus-

---

22. *See. e.g., United States v. Pollard*, 959 F.2d 1011 (D.C.Cir.) (discussing the espionage activity of an Intelligence Research Specialist with the U.S. Navy on behalf of Israel), *cert. denied*, 506 U.S. 915, 113 S.Ct. 322, 121 L.Ed.2d 242 (1992); *United States v. Whitworth*, 856 F.2d 1268 (9th Cir.1988) (recounting how the defendant, a radioman for the U.S. Navy, stole confidential messages on behalf of the former Soviet Union), *cert. denied*, 489 U.S. 1084, 109 S.Ct. 1541, 103 L.Ed.2d 846 (1989); *United States v. Walker*, 796 F.2d 43 (4th Cir.1986) (explaining that the defendant obtained a job with VSE Corporation, a defense contractor, in order to gain access to classified information to transmit to the KGB).

23. Despite the government's statements concerning the gravity and depth of Pitts' betrayal and its harm to the FBI, it neither supported nor sought an upward departure, other than in conjunction with the grouping decision. Moreover, the Director of the FBI did not seek, as permitted by the Guidelines, an upward departure as "a sanction ... necessary to protect national security or (to) further the objectives of the nation's foreign policy." U.S.S.G. § 2M3.2, Application Note 3.

tify or mitigate his actions.[24] Even to assert such excuses is a further affront. They are indefensible; none abrogates Pitts' moral and legal duty not to betray his country.

And while Pitts expressed genuine remorse for his actions at sentencing, it is doubtful that his remorse is yet commensurate with the enormity of his offense, which can only begin to be measured by counting and acknowledging the legions of grave markers on battlefield and military cemeteries all over the world memorializing those who sacrificed all for this nation's principles and security. As a first step in his long journey of remorse, Pitts owes each of these persons and their memory an abject apology.

The Court further **ORDERS** that this Sentencing Memorandum be appended to, and made a part of, the PSIR, pursuant to Rule 32(c)(3)(D), Fed.R.Crim.P.

---

**24.** Specifically, Pitts claims that, among other reasons, he became a foreign agent because: (1) he was physically and mentally exhausted by his workload when stationed as the resident agent in rural virginia; (2) his morale was "battered" by a negative appraisal from his supervisor; (3) that his transfer to the FBI's bureau in New York city was a professional dead-end that created marital discord and financial strain; and (4) he and his wife were exposed to carbon monoxide from a defective heater in their rented cottage.