**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                            No. 97-4616

EARL EDWIN PITTS,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T.S. Ellis, III, District Judge.
(CR-96-483-A)

Argued: January 28, 1999

Decided: May 4, 1999

Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge,
and GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Goodwin wrote the opinion, in
which Chief Judge Wilkinson and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Nina Jean Ginsberg, DIMURO, GINSBERG & LIEBER-
MAN, P.C., Alexandria, Virginia, for Appellant. Randy I. Bellows,
Assistant United States Attorney, Alexandria, Virginia, for Appellee.
**ON BRIEF:** Helen F. Fahey, United States Attorney, Kathleen M.
Kahoe, Assistant United States Attorney, Alexandria, Virginia, for
Appellee.

**OPINION**

GOODWIN, District Judge:

Former FBI agent Earl Edwin Pitts pled guilty on February 28, 1997 to one count of conspiracy to commit espionage and one count of attempted espionage in violation of 18 U.S.C.§ 794. Pitts now challenges his sentence. He argues that the convictions for the two offenses should have been grouped under the United States Sentencing Guidelines (Guidelines). Next, Pitts argues that the district court erred in departing upward for an extraordinary abuse of trust. Finally, Pitts urges that his post-arrest cooperation with the government warranted a downward departure from the Guidelines range.**1** We affirm.

I.

On September 18, 1983, Earl Edwin Pitts, a citizen of the United States, joined the FBI as a special agent. He took the solemn oath of office and signed an employment agreement, promising-- as all of this nation's trusted FBI agents do -- "to support and defend the Constitution of the United States" and to protect secret information accessed during his tenure at the bureau. Less than four years later, a dejected and angry Pitts entered into a conspiracy with agents of the Union of Soviet Socialist Republics (Soviet Union) to betray his country. In 1997, he would plead guilty to that conspiracy and to an attempt to commit espionage. He was sentenced to 324 months imprisonment.

Pitts was originally assigned to the FBI Field Office in Alexandria, Virginia, where he investigated white collar and narcotics crimes. After a brief stint in Fredericksburg, Virginia, Pitts was assigned to work as a member of a foreign counterintelligence (FCI) squad in New York City.

_____

**1** Pitts also appeals from the district court's alternative determination that if the convictions did group, then the district court would depart upward from the Sentencing Guidelines to reach the same offense level. This Court does not reach that proposed assignment of error.

As an FCI agent, Pitts was responsible for investigating officers of the Committee for State Security, Komitet Gosudarstvennoy Bezopasnosty (KGB), the former intelligence service for the Soviet Union. He was trusted with access to very sensitive and highly classified materials related to counterintelligence operations, surveillance of Soviet officials assigned to the United Nations, and the true identities of American agents and Soviet defectors. For example, Pitts had access to the "Soviet Administrative List," a computerized listing of the names, postings, and known or suspected intelligence affiliation of each Soviet official assigned to the United States.

A law school graduate and retired Army Captain, Pitts, according to his "psychiatric consultant," had dreamed of working for the FBI as a means of escaping his small town Missouri roots. His assignment to New York City to investigate agents of the "Evil Empire" would reasonably have been expected to fulfill that dream. However, Pitts's transition to New York City went badly. The consultant reported that

> [Pitts] blamed the FBI for his reduced prospects and circumstances. A seeming inspiration arrived like a bolt of lightning: If he were to self-recruit to work for the KGB, he could solve two problems at one stroke: dig out of his money morass, and get back at the FBI. He did so.

(J.A. at 784.)

On July 15, 1987, Pitts contacted a Soviet citizen whom he had been surveilling. Pitts divulged surveillance information to the Soviet that he previously had reported to the FBI in a memorandum classified as "Secret." The Soviet set up a meeting with a high-ranking KGB officer, Alexandr Vasilyevich Karpov, whose duties included the penetration of the intelligence and security services of the United States. Karpov and Pitts met in the New York Public Library.

From October 1987 to October 1992, Pitts spied for the KGB and its successor organization, the Sluzhba Vneshney Rasvedi Rossii (SVRR). In direct violation of the trust placed in him by his country, Pitts delivered classified materials -- including the important "Soviet Administration List" -- to the Soviet Union and later to Russia in return for at least $124,000 in cash payments and another $100,000

3

held in escrow. Pitts also passed FBI surveillance information concerning Soviet diplomats and information concerning at least one FBI human asset who had been reporting covertly on Russian intelligence matters. The full extent of Pitts's treason may never be known.

While spying for the Soviets and Russians, Pitts requested a series of job transfers that provided him with access to varying types of operational and classified information. In 1989, Pitts was promoted to Supervisory Special Agent and assigned to the Records Management Division of the Document Classification Unit at FBI Headquarters in Washington, D.C. There, he worked on classification appeals. In January 1991, he was transferred to the Security Programs Unit at FBI Headquarters, where he worked on security issues related to Freedom of Information Act requests. In September 1992, Pitts was assigned to the DNA Legal Assistance Unit of the FBI's Legal Counsel Division. Finally, in February 1994, Pitts was assigned to the Behavioral Science Unit at Quantico, Virginia, where he served as an instructor until his arrest. After his transfer to Washington, Pitts made nine trips to New York to deliver classified and other materials to his Soviet and Russian handlers. Pitts's active espionage continued uninterrupted until finally ending in October 1992 when Pitts failed to attend a scheduled meeting with his contact.

For almost three years following his missed meeting, Pitts had no contact with his foreign co-conspirators. In August 1995, he unexpectedly received a letter at his home from the Soviet citizen whom he had first contacted in 1987. Pitts did not respond. Two weeks later, the former citizen -- now covertly working for the FBI in a sting operation code-named "False Flag" -- visited Pitts at his residence. He told Pitts that a "guest from Moscow" wished to meet with him. Pitts agreed and later met with the "guest," who was an FBI undercover agent. At the meeting, the "guest" asked for Pitts's assistance in further espionage and Pitts pledged to "do what I can."

Thereafter, from August 1995 until his arrest in December 1996, Pitts attempted to engage in extensive espionage activities. He passed classified and other materials to individuals whom he believed were officers of the SVRR, but were, in fact, FBI agents, undercover officers, and FBI informants. During the course of False Flag, Pitts attempted to provide or made preparations to provide his undercover

4

FBI handlers with computer diskettes containing information classified as "Secret;" confidential FBI internal information; personal, medical, and familial information concerning a number of fellow FBI agents; his personal identification badge for entry to the FBI Academy grounds and buildings; a key to a secure FBI Academy building; an FBI National Academy briefcase; and other information designed to facilitate access to the FBI Academy facilities. Further, Pitts attempted to deliver a telecommunications device used to transmit classified information. He accepted $65,000 for twenty-three drops of FBI information and documents, nine telephone conversations, and two face-to-face meetings with his undercover FBI handlers.

In December 1996, the FBI finally closed the False Flag sting operation. Agents arrested Pitts and halted his attempted espionage activities. Pitts was charged in a twelve-count indictment with conspiracy to commit espionage in violation of 18 U.S.C. §§ 794(a), (c); attempted espionage in violation of 18 U.S.C. § 794(a); communication of classified information without authority in violation of 50 U.S.C. §§ 783(a), (c); bribery in violation of 18 U.S.C. § 201(b)(2)(C); and conveyance without authority of property of the United States in violation of 18 U.S.C. § 641. On February 28, 1997, Pitts pled guilty to one count of conspiracy to commit espionage and to one count of attempted espionage. The remaining counts were dismissed upon motion of the government.

On June 23, 1997, the district court sentenced Pitts to concurrent terms of 324 months imprisonment to be followed by a five-year period of supervised release and imposed a $200 special assessment. United States v. Pitts, 973 F. Supp. 576, 584 (E.D. Va. 1997). In calculating the appropriate guideline range, the district court began with a base offense level of thirty-seven. The court enhanced the offense level by two due to Pitts's abuse of trust, applied the grouping rules to increase the offense level by two more levels, reduced that total by three for acceptance of responsibility, and then departed upward by one level after finding that the abuse of trust enhancement did not fully reflect Pitts's abuse of trust. The Court found the total offense level to be thirty-nine.

II.

Pitts first contends that the district court erred when it determined that his counts of conviction for attempted espionage and conspiracy

5

to commit espionage should not be grouped for sentencing purposes. We review questions involving the legal interpretation of the Guidelines de novo. United States v. Wessells , 936 F.2d 165, 168 (4th Cir. 1991); United States v. Toler, 901 F.2d 399, 401 (4th Cir. 1990). The district court's findings of facts, however, are reviewed for clear error. United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir. 1989).

Section 3D1.2 of the Guidelines provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2. Counts implicate substantially the same harm when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G.§ 3D1.2(b). Application Note 4 gives further instruction:

> [C]ounts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times. This provision does not authorize the grouping of offenses that cannot be considered to represent essentially one composite harm (e.g. , robbery of the same victim on different occasions involve multiple, separate instances of fear and risk of harm, not one composite harm).

> When one count charges a conspiracy or solicitation and the other charges a substantive offense that was the sole object of the conspiracy or solicitation, the counts will be grouped together under subsection (b).

Id. at comment. (n.4).

The critical determinations relevant to the grouping decision are whether or not the offenses constitute a single course of conduct and whether or not the offenses are connected by a common criminal objective.**2** Id. Both determinations are heavily fact specific. See id. (providing examples).

_____

**2** Pitts contends that the victim of both offenses was the Nation's societal interest. We accept that characterization without making a specific finding.

6

The determination of whether or not actions constitute a single course of conduct is not necessarily an easy one for the district court to make. See United States v. Bonner, 85 F.3d 522, 525 (11th Cir. 1996) (finding that decision is "not always clear cut" and directing sentencing courts to consider Guidelines' Introductory Commentary because existing case law provides only "some guidance"). Neither we, nor our sister circuits, have previously articulated factors appropriate for a district court to consider in making this determination. A district court, when determining whether actions constitute a single course of conduct should consider the Guidelines Commentary and the following factors in making the critical determination of whether or not multiple offenses constitute a single course of conduct: the duration of the defendant's conduct and whether the conduct of conviction overlaps in time, the locations in which the conduct occurs, the persons involved, the means used to accomplish the criminal purpose, and the separateness of the fear and risks of harm created by the defendant's multiple acts.**3** No specific factor should control; the district court is to weigh them as the facts and circumstances of the individual case require.

Whether or not offenses are connected by a common criminal objective is also a critical determination. While there are few published decisions, we are of the opinion that a defendant cannot merely define his scheme in broad fashion and argue that all of his conduct was undertaken to satisfy that broad goal. Rather, a more particularized definition of the defendant's intent is required. See United States v. Norman, 951 F.2d 1182, 1185 (10th Cir. 1991) (rejecting government position that scheme was narrowly designed and defining defendant's purposes broadly); United States v. Wilson, 920 F.2d 1290, 1294 (6th Cir. 1990) (same).

_____

**3** **See Wessells**, 936 F.2d at 169 (finding the interval of time relevant); see also United States v. Griswold, 57 F.3d 291, 296 (3d Cir. 1995) (time and separateness of fear and risk of harm); United States v. Miller, 993 F.2d 16, 21 (2d Cir. 1993) (separate instances of psychological harm); United States v. Sneezer, 983 F.2d 920, 924 (9th Cir. 1992) (time); United States v. Cousens, 942 F.2d 800, 805-806 (1st Cir. 1991) (means used to accomplish crime and time period; location; and people involved); United States v. Wheelwright, 918 F.2d 226, 231 (1st Cir. 1990) (same).

Where the criminal conduct of the defendant constitutes ongoing behavior toward a single goal that is in fact accomplished only by the entirety of the defendant's conduct, and where the behavior is ended upon the completion of that single goal, then the district court must group the offenses. See Bonner, 85 F.3d at 526 (analyzing grouping guideline and related cases). Where, however, the defendant's criminal conduct constitutes single episodes of criminal behavior, each satisfying an individual -- albeit identical -- goal, then the district court does not group the offenses. See id. (applying test); Norman, 951 F.2d at 1185 (same); Wilson, 920 F.2d at 1294 (same).

Here, the district court properly determined that the counts of conviction did not constitute a single course of conduct with a single objective. In deciding that the counts of conviction did not constitute a single course of conduct, the district court carefully considered the undisputed facts that the counts depended upon two separate time periods, involved the supplying of information to two distinct sets of people in two separate locations, and resulted in the passage of an entirely different category of sensitive materials involving separate and distinct instances of harm. Pitts, 973 F. Supp. at 581-82.

It is also clear that the defendant's actions were not connected by a common criminal objective. The defendant did not intend merely to transfer a sum certain of sensitive information to a foreign power with the intent to terminate the relationship as soon as that goal was completed. Rather, the defendant aimed to hand over as much sensitive information as he could. Each act of espionage satisfied that goal to a degree unrelated to and independent of every other act of espionage.

The district court determined that Pitts's conduct was not a single course of conduct with a single objective as contemplated by the Guidelines. We find no error in those conclusions.

III.

Pitts next contends that the district court erred in departing upward one level based upon the district court's finding that the defendant's abuse of trust was extraordinary. Pitts admits that he held a position of trust and that he abused the trust placed in him. He therefore agrees with the district court's decision to apply the two-level enhancement

pursuant to Section 3B1.3 of the Guidelines. However, Pitts argues that because he was no more culpable than other counterintelligence or supervisory agents who hold similar positions and who may also commit crimes, a departure was unwarranted. We disagree.

A sentencing court is required by statute to impose a sentence of the kind, and within the range, determined by a proper application of the Guidelines, "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553. Typically, the sentencing court must consider whether the facts and circumstances giving rise to the crime involved are encompassed within the heartland of situations to which the Guidelines range was intended to apply. Congress has further provided by statute that "[i]n determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." Id.

We review the decision of the district court to depart for an abuse of discretion. See Koon v. United States, 518 U.S. 81 (1996); United States v. Barber, 119 F.3d 276, 282 (4th Cir. 1997). The district court did not abuse its discretion here. It determined the circumstances and consequences of the offense of conviction; decided that Pitts's abuse of trust appeared "atypical," such that it would potentially take the case out of the applicable guideline's heartland; and finally found that the circumstances and consequences appropriately considered take the case out of the applicable guideline's heartland and that a departure from the guideline's specified sentencing range was therefore warranted. Pitts, 973 F. Supp. at 583-84.

When a sentencing court departs based upon a factor upon which an enhancement rests, the departure is warranted only if the enhancement is inadequate. See Rybicki, 96 F.3d at 757-58. It is therefore necessary first to consider the parameters of the enhancement in order to determine whether a particular case is outside of the heartland of ordinary enhancement cases. Id. In making that latter determination, we compare the defendant's position and conduct to all defendants who

9

qualify for the enhancement, not just to those who commit the crime with which he is charged.

We have held, in considering the Section 3B1.3 enhancement for abuse of trust, that sentencing courts may consider: (1) whether the defendant had special duties or "special access to information not available to other employees;" (2) "the defendant's level of supervision or `degree of managerial discretion'"; and (3) whether an examination of the acts committed establishes that this defendant is "`more culpable' than others who hold similar positions and who may commit crimes." United States v. Glymph, 96 F.3d 722, 727 (4th Cir. 1996). It is certainly also important to inquire into the level of harm occasioned by the breach of trust. See United States v. Siciliano, 953 F.2d 939, 942-43 (5th Cir. 1992) (finding that guard's abuse of trust implicated security of prison he was charged with protecting); United States v. Bartsh, 985 F.2d 930, 935 (8th Cir. 1993) (finding that bankruptcy trustee's fraud victimized very individuals he was to aid). But see United States v. Kaye, 23 F.3d 50, 54 (2d Cir. 1994) (finding harm to victim irrelevant).

An upward departure from the Guidelines based upon an extraordinary abuse of trust is warranted if the combination of the level of trust violated by the defendant and the level of harm created solely by the violation of that trust falls outside the heartland of cases that qualify for the enhancement.

The district court found that the level of trust placed in Pitts was nearly unmatched. Pitts, 973 F. Supp. at 583-84. Pitts was a supervisory special agent of the FBI and a foreign counterintelligence operative. His job, during much of the time in which he was betraying his country, was to thwart the espionage activities of the very foreign intelligence service with whom he conspired. He represented this nation's defense against foreign espionage activity. In violating that "awesome responsibility and trust," Pitts violated a level of trust to which most men are never exposed. Id. at 584. Furthermore, the district court found significant harm arising from the breach of that trust: "the protection of secret and confidential national security information," "the ability and capacity to gather foreign intelligence information," and "the reliance on the trustworthiness of American

10

intelligence and law enforcement officers" were each irreparably damaged. Id. at 580 n.11.

Pitts presents several other espionage cases in which the sentencing court did not depart based upon abuse of trust. He argues that because the courts in those spy cases did not depart, the district court erred in departing in his case. He argues that this is so because the material turned over to foreign powers by those other spies was more damaging to our country than the material he turned over. We find the argument unpersuasive in part because it is premised on a fundamental misconception of the basis for an abuse of trust departure and in part because we find no factual support for it.

The harm resulting from the actual offense conduct is irrelevant to a decision to depart based upon an extraordinary abuse of trust. In considering comparative cases to determine whether particular circumstances fall within the heartland of abuse of trust cases, the relevant harm is the harm created by the violation of trust, not from the offense. The Sentencing Commission chose to assign a base offense level for offense conduct in Chapter Two of the Guidelines. When considering whether the Chapter Three two-level enhancement is sufficient in a particular case, the court is concerned only with the harm created solely by the violation of trust. Insofar as Pitts argues that the information he divulged to foreign powers was less sensitive than that turned over by other spies, that suggestion is relevant only to whether a downward departure from the base offense level is warranted and not to whether an upward departure for abuse of trust is warranted.

Further, courts considering whether or not to depart upward based upon abuse of trust are cautioned not to compare the defendant's abuse of trust to a narrowly defined group. Based on a factor we found relevant in Glymph, Pitts proposes that we compare his abuse of trust to the trust abused by other spies. His reliance on Glymph is misplaced. Glymph is an abuse of trust case, not a departure case. There the issue was the threshold question of whether the defendant's position was one of trust in the first place, not the dynamic concern of whether the abuse of trust was extraordinary. Thus, when we determined that it is relevant for a court to consider whether the defendant is "`more culpable' than others who hold similar positions and who may commit crimes," we held that a person, like a bank teller, who

11

does not otherwise qualify for the enhancement by title alone, may nevertheless qualify if he is more culpable (i.e., more entrusted) than others in that position. Glymph, 96 F.3d at 727. We are not of the opinion that a bank president, for example -- who would almost universally qualify for the enhancement -- could avoid the enhancement because he is equally or less culpable than other corporate presidents. Nor are we of the opinion that Pitts may avoid the upward departure because he is no more trusted than his fellow traitors. That consideration is irrelevant here. See United States v. Bartsh, 985 F.2d 930, 935 (8th Cir. 1993) (finding abuse of trust departure for bankruptcy trustee "almost compelled" by similar holding concerning another bankruptcy trustee without regard for comparative culpability).

Even were we to accept Pitts's interpretation of the departure analysis -- which we do not -- we find no factual support for his conclusion that the district court erred. In the espionage cases Pitts cites, departures based upon abuse of trust were not considered by any court. See United States v. Pollard, 959 F.2d 1011 (D.C. Cir. 1992); United States v. Morrison, 844 F.2d 1057 (4th Cir. 1988); United States v. Whitworth, 856 F.2d 1268 (9th Cir. 1988); United States v. Pelton, 835 F.2d 1067 (4th Cir. 1986); United States v. Ames, No. 94-166-A (E.D. Va. April 28, 1994); United States v. Nicholson, No. 96-448-A (E.D. Va. June 5, 1997). In fact, enhancements were not even considered. The cases are not appropriate for comparison purposes.**4**

Our sister circuits have found departures for abuse of trust warranted under circumstances similar to those before us. See Kaye, 23 F.3d at 54 (departing upward when defendant defrauded great-aunt of life's savings); Bartsh, 985 F.2d at 935 (departing upward when bankruptcy trustee -- a federal officer appointed by the court to assist victims of fraudulent activity -- "victimized those same individuals a second time by embezzling over $1.5 million dollars"); United States v. Barr, 963 F.3d 641, 654 (3d Cir. 1992) (departing upward when high-ranking official with Department of Justice made false written

_____

**4** Only in the materials submitted in the record by the defendant relating to Nicholson is abuse of trust arguably even mentioned by implication and that was merely in the context of a plea agreement in which the government agreed not to seek any departures from the Guidelines. (J.A. at 670.)

12

and oral statements to agency of United States and conspired to possess and did possess cocaine); <u>Siciliano</u>, 953 F.2d at 942-43 (departing upward when deputy sheriff and prison guard sold drugs in prison and thereby "jeopardiz[ed] the security of a prison he is charged with protecting."). In each of those cases, the respective circuit court found that the level of trust violated, combined with the harm solely resulting from that violation -- regardless of the harm resulting solely from the offense of conviction -- justified a departure. We find that the district court did not abuse its discretion.

IV.

Pitts finally contends that the sentencing judge should have been more lenient in choosing his exact term of imprisonment within the guidelines range. The court determined that Pitts had a total offense level of thirty-nine and that the applicable guidelines range was 262 to 327 months. The court sentenced Pitts to 324 months imprisonment.[5] Pitts argues that the sentencing judge erroneously believed that Pitts's more than seventy hours of FBI debriefings were required for acceptance of responsibility and therefore failed to consider his unusual cooperation in determining his sentence. Notably, Pitts does not argue that the court should have departed downward for extraordinary acceptance of responsibility nor that the court failed properly to reduce his offense-level three levels for acceptance of responsibility. Instead, he requests that this court strip the sentencing judge of his discretion to set the defendant's sentence within the proper guidelines range. This, we cannot do.[6]

_____

[5] The Court recognized that the Guidelines range exceeded 24 months and specifically found that the sentence imposed met "the need for punishment and deterrence." (J.A. at 660.)

[6] We can review a decision based upon a claim that the sentence "was imposed in violation of law." 18 U.S.C. § 3742. It is possible to read the defendant's appeal as one based on a claim that the district court improperly believed that it could not consider the defendant's extraordinary cooperation or that the district court gave impermissible or no reasons for imposing a sentence at the upper end of the guidelines range. Neither appeal would have merit. The sentencing court specifically stated that it imposed the sentence of 324 months because the sentence "adequately satisfies the Guidelines' goals relating to deterrence, retribution, and

13

As this Court held in response to a similar challenge in <u>United States v. Porter</u>, 909 F.2d 789, 794-95 (4th Cir. 1990), "[t]his challenge does not state an appealable question under 18 U.S.C. § 3742." <u>Id</u>.

V.

Accordingly, the sentence imposed by the district court is

<u>AFFIRMED</u>.

_____
incapacitation." <u>Pitts</u>, 973 F. Supp. at 584. The court did not indicate a belief that it was foreclosed from considering Pitts's post-conviction cooperation. In fact, the court did consider various excuses offered by Pitts and found that they "can never justify or mitigate his actions. Even to assert such excuses is a further affront." <u>Id</u>. at 584-85.

14