**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

Case No. 17-3415

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jun 04, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| STEPHAN D. BOGGS, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | **O P I N I O N** |

_____

**BEFORE:  McKEAGUE, GRIFFIN, and WHITE, Circuit Judges.**

**McKEAGUE, Circuit Judge.**  As a rule, people like to get what they pay for.  Certainly that's true of the Department of Defense (DOD), which is tasked with buying military equipment. So when the DOD discovered that many items it had purchased from a machine shop owned by Stephan Boggs,[1] a long-time DOD contractor, varied from the requirements specified by the DOD, it started an investigation.  That investigation yielded a 25-count superseding indictment against Boggs for mail fraud and false claims.  Boggs went to trial, where a jury convicted him on all 25 counts.  The district court thereafter sentenced Boggs to 24-month concurrent sentences, below the 37 to 46 months guidelines range, and ordered him to pay $ 279,650.20 in restitution.  In this

_____

[1]      Both the government and Boggs's own counsel spell Boggs's first name in various ways: Stephan (both briefs in the caption), Stephen (Boggs's Br. at vi), Steven (Government's Br. at 5).  We opt for Stephan, which appears most consistently throughout the record.  CM/ECF lists Boggs as Stephan D. Boggs.

appeal, Boggs challenges the sufficiency of the evidence supporting his convictions and presses four other claims. Finding none of his arguments persuasive, we **AFFIRM**.

**I**

*Factual Background.* The DOD issues solicitations for items needed by the military. Solicitations contain detailed specifications for each item, sometimes including a drawing. Vendors vying for these government contracts submit bids on solicitations through a web-based system. If a vendor submits a bid "without exception," he warrants that he will provide the item exactly as specified in the solicitation; a bid submitted "with exception," however, means the vendor will provide the item with some modification. When the specification includes a drawing, the bid must indicate whether the bid is for parts in accordance with the drawing. The DOD evaluates the bids and issues a purchase order to the selected vendor.

Once a vendor has been awarded a contract, it has three choices. It can provide the part as specified, request a variance, or cancel the order. A vendor may not unilaterally vary from its bid; any change must be requested by the vendor and approved by the DOD.

DOD quality-assurance specialists inspect whether items are in accord with the specifications. Some contracts, though, allow items to be provided without physical inspection by the DOD based on a Certificate of Conformance (COC) from a vendor stating that the items conform to the contract's specifications. The DOD will permit this procedure in lieu of inspection when it has confidence in the vendor's reliability. Similar to the COC procedure, the DOD may implement an Alternate Release Procedure (ARP) based on confidence that a particular vendor has produced conforming items. A vendor may qualify for this program based on past inspection of production processes and a review of its quality-assurance program. As with the COC, no physical inspection of the items occurs; the DOD relies on the vendor's own inspection and certification.

Based on a track record dating back to 1986, defendant Stephan Boggs, president and owner of Boggs and Associates, was eligible for both the COC and ARP inspection procedures. That meant the DOD would at times forego a visual inspection of the parts Boggs provided and rely on his certification that the parts were conforming.

From April 2010 through January 2014, Boggs submitted bids on a variety of DOD solicitations. The DOD ultimately issued Boggs purchase orders on many of them, including for parts and components for use on military aircraft, land vehicles, and sea vessels. Boggs's bids represented that he would provide all parts "without exception," and thus in accordance with the drawings and specifications provided. In light of Boggs's favorable contract history, the DOD accepted Boggs's parts under the relaxed COC and ARP procedures.

That trust, it turns out, was misplaced. A DOD inspection team discovered various nonconformities in several of Boggs's products. These nonconformities included material substitutions, dimensional defects, and missing or added features—swapping wood for acetate in one instance, using zinc-plated nuts instead of stainless- steel ones in another. Because many of the parts had already been shipped by the time the defects were discovered, the DOD instructed the military branches to suspend use of the items.

Boggs never requested a variance from the contract requirements on any of the purchase orders at issue. He instead submitted certifications, inspections records, and invoices to the DOD, all representing that he had complied with the terms of the purchase orders. Unaware of the nonconformities, the DOD paid Boggs on each contract where Boggs had provided nonconforming parts.

*Indictment and Trial.* On November 3, 2015, a federal grand jury indicted Boggs on four counts of mail fraud in violation of 18 U.S.C. § 1341 and eight counts of false claims under

18 U.S.C. § 287. On April 19, 2016, a superseding indictment issued, charging Boggs with the same four mail fraud counts (Counts 1-4) but this time charging 21 counts of false claims (Counts 5-25).

The mail-fraud counts alleged that Boggs and his company knowingly transmitted by mail nonconforming parts. The false-claims counts alleged that Boggs and his company knowingly and willfully made false claims to the DOD by supplying nonconforming parts but submitting invoices for the parts that certified the parts were conforming.

During its case-in-chief, the government presented evidence of the 25 contracts at issue in the charged counts, but also provided evidence on five additional contracts involving nonconforming parts. At the close of the government's case, Boggs moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Boggs argued that acquittal was required because the "jurors could possibly find a result here that is based on confusion as opposed to the evidence." The district court denied the motion, reasoning that "the government has done a good job in organizing and presenting the evidence," particularly through its use of digital exhibits showing the "potentially complicated drawings and engineering specifications." As such, the court concluded "that a reasonable jury could find in favor of the government on each" count in the indictment.

On July 20, 2016, the jury did just that, returning a guilty verdict on all counts.

*Sentencing*. The Presentence Report recommended a two-level enhancement for abuse of a position of trust under United States Sentencing Guidelines § 3B1.3. The PSR also calculated restitution at $284,465.19, based on the amount paid on the 46 contracts for which Boggs provided nonconforming parts during the 2010 to 2014 period charged in the indictment, plus the costs of

testing and re-bidding. Boggs objected to the § 3B1.3 enhancement but not to the restitution amount.

The district court overruled Boggs's objection and applied the abuse-of-trust enhancement. That enhancement put Boggs's Guideline range at 37 to 46 months. The district court, however, varied downward and imposed a below-guidelines sentence of 24 months on each count, running concurrently. After the government noted that the proper restitution figure was lower than the PSR's recommendation, the court ordered Boggs to pay $279,650.20 in restitution.

This appeal followed.

**II**

Boggs presents five issues on appeal. First, he argues that the jury verdicts on all 25 counts against him were not supported by sufficient evidence. Second, he contends that the district court wrongly admitted evidence of additional nonconforming contracts beyond those directly at issue in the charged counts. Third, he says the district court erred by ordering recesses during the government's examination of its witnesses. Fourth, he faults the district court for applying the abuse-of-trust enhancement at sentencing. Fifth and finally, Boggs asks us to remand for a new restitution calculation. We take these issues in turn.

*Sufficiency of the Evidence*. Boggs argues that the evidence presented at trial was insufficient to sustain his convictions for mail fraud and false claims. To convict on the four mail fraud counts, the jury instructions required the jury to find beyond a reasonable doubt that (1) Boggs "knowingly and intentionally devised . . . a scheme or artifice to defraud"; (2) Boggs "did so with intent to defraud"; (3) "the scheme included a material misrepresentation or concealment of a material fact"; and (4) "the defendant knowingly and intentionally used . . . [an] interstate carrier" to commit the fraud. To convict on the 21 false- claims counts, the government

had to prove beyond a reasonable doubt that (1) Boggs "knowingly made or presented a claim against the United States"; (2) this claim was made or presented to a department or agency of the United States"; (3) Boggs "knew at the time the claim was made . . . that the claim was false or fraudulent"; and (4) "the claim was false or fraudulent as to a material matter."

Boggs does not argue that the evidence failed to establish that the items he provided were nonconforming or that the variations were material. The unauthorized changes Boggs made to the items he provided were at times substantial. *See, e.g.*, R. 93, Tr., PID 1666 (using nonconforming zinc nuts, which would corrode easily in a saltwater atmosphere, in parts for aircraft carrier catapult gear); *id.* at PID 1668 (using weaker zinc instead of stronger cadmium on firing lanyard hook); R. 92, Tr., PID 1451 (providing component part with faulty dimensions, making it "unacceptable to use" in end product). Boggs argues that the evidence did not establish he acted with the intent required for either offense. Boggs's Br. at 31 ("Here, Boggs was the essence of good faith.").

Though we review the district court's denial of a motion for acquittal based on insufficient evidence de novo, we "must affirm the district court's decision if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S 307, 319 (1979)); *see also United States v. Bankston*, 820 F.3d 215, 235 (6th Cir. 2016). "In deciding whether a conviction is supported by substantial and competent evidence, we do not weigh the evidence, assess the credibility of witnesses, or substitute our judgment for that of the jury, and we draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Smith*, 749 F.3d 465, 477 (6th Cir. 2014) (internal citations and quotation marks omitted).

Boggs's sufficiency challenges fail for one basic reason: his arguments all ask the court, at bottom, to re-weigh the evidence and make fresh credibility determinations. That we cannot do. Tellingly, while the government marshals the evidence that would support the jury's verdict, Boggs instead focuses only on the evidence that would undermine it. In doing so, Boggs forgets that we must view the evidence at trial in the light most favorable to the prosecution's case, *Cunningham*, 679 F.3d at 370, and that we may not re-weigh the evidence, *Smith*, 749 F.3d at 477. Moreover, Boggs emphasizes evidence regarding his personal virtues, including his honest reputation and his military service. *See, e.g.*, Boggs's Br. at 37 (recounting testimony about Boggs's "strong reputation personally, professionally, and in the community" and calling Boggs an "honest patriot"). But it is the jury's job—not ours—to make credibility determinations.

A few examples typify Boggs's treatment of the evidence against him. Start with the mail-fraud evidence and specifically that related to Counts 1 and 2. These counts involved button assemblies for use on the catapult arrest gear for aircraft carriers—the device that sling shots and stops departing and returning jets. The contract required the button assemblies to be made with stainless steel nuts; Boggs testified that he knew this, and yet he decided to use less expensive zinc-plated nuts, believing them to be stronger. A government witness testified that this was a big problem for the Navy: because zinc offered far less "corrosion resistance" to saltwater than stainless steel, the "saltwater atmosphere would destroy" the nuts at a faster rate. The government also introduced an exhibit showing that Boggs had worked out the cost differential between using the required stainless-steel nuts and using the nonconforming zinc-plated nuts, and testimony that the swap earned Boggs "a savings of $12.43 per part." Asked why he did not disclose his use of zinc-plated nuts and whether the inspection report he signed was "not true," Boggs said "[i]t is true

as to what I mean when I sign something like that," which is "I am giving them good products that will do what they are supposed to do."

From all this evidence, the jury could conclude that Boggs acted with the intent to defraud the government. Boggs tries to resist this conclusion by highlighting other testimony from Boggs where he claims he used the nonconforming zinc-plated nuts only because he "believed they would be stronger" than the undersized stainless-steel nuts he purchased because he was unable to locate the required 5/8" size. While this testimony was worth emphasizing in a mens rea argument before the jury, it has little purchase in this appeal—where we must assume the jury resolved credibility determinations against Boggs and drew all available inferences in favor of the prosecution.

Boggs tries the same tack with the false-claims evidence. Consider the evidence introduced regarding Counts 23 through 25, involving contracts for vehicle door latches. At trial, the government introduced evidence that the latches Boggs supplied were nonconforming in four ways. The government later elicited testimony from government investigator James Terbovich that Boggs used "white-out" on his inspection reports for these parts, which left Terbovich "concerned that those characteristics were just changed—were the only things changed on the inspection report, basically an old inspection report with a new contract number and a new signature and a new lot size." The inspector testified that this suggested "that the parts were not inspected" and that Boggs may have used white-out to "show that things were done when they actually were not." Boggs testified to the contrary: he said the inspections were legitimate, and he reused paperwork to save time.

On appeal, Boggs suggests that his conflicting testimony should have precluded the jury from crediting Terbovich's. Boggs's Br. at 35 ("Boggs offered a reasonable explanation for [the white-out], indicating that he was a paper guy instead of a computer guy . . . ."). The jury, however,

was free to choose how to resolve the conflicting testimony, and we are required to assume that the jury resolved the conflict in favor of the prosecution. Once we do so, the bottom line is this: testimony like Terbovich's, accompanied by exhibits that showed Boggs's white-out-laden reports, lends ample support to the jury's conclusion that Boggs knowingly made false claims to the government.

This pattern permeates Boggs's entire sufficiency challenge, making it unnecessary to recount the evidence supporting Boggs's convictions on all 25 counts. It is hard enough to succeed on a sufficiency challenge as it is, but Boggs surrendered any chance he had by asking this court to re-weigh evidence and make credibility determinations anew.

But even if Boggs played by the rules governing our review of jury verdicts, his argument would still fail, given the powerful indications that Boggs acted with the intent required to commit mail fraud and make false claims. As the government notes, the sheer "nature and number of the nonconformities is itself strong evidence that the false certifications and claims were not accidental." Not only did Boggs supply nonconforming parts on over 20 contracts—from the button assemblies to the door latches to the firing lanyards—but he also veered from an individual contract's requirements in multiple ways. *See, e.g.*, R. 89, Tr., PID 952; R. 91, Tr., PID 1187-88 and 1236-44 (describing three nonconformities on the firing lanyards). What is more, the deviations were often obvious ones, making it easy for the jury to conclude that Boggs knew what he was doing. *See, e.g.*, R. 89, Tr., PID 952-53 (supplying wooden rather than black acetate handle[2]). Finally, there were the shoddy inspection reports and Boggs's own testimony that he

---

[2]     Boggs admits this is an obvious deviation and argues that this negates any inference that he intended to deceive the DOD. Boggs maintains that if he wanted to defraud the government, he "would have painted the handles so nobody would have known they were wood." Maybe so. But then again, if Boggs did *not* wish to defraud the government, why didn't he request a variance or admit the handle was nonconforming on his inspection report? And why, unless he did intend to deceive the government, would Boggs provide the DOD with a certification indicating he had purchased black acetate for the handle?

knew he was supplying nonconforming parts but independently adjudged his deviations to be improvements. *See e.g.*, R. 99, Tr., PID 1999 (claiming he used zinc rather than stainless steel nuts because he "believed they would be stronger"); R. 99, Tr., PID 2039-40 (claiming he used one pin instead of two on a machine gun mount because "it would hold it in position better"). From all this evidence, the jury could conclude that Boggs intended to defraud the government (as required for the mail-fraud convictions) and knowingly made false claims (as required for the false-claims convictions).

We therefore hold that Boggs's convictions were supported by sufficient evidence.

*Admission of Additional Evidence*.  Boggs argues that the district court erred in admitting evidence of five additional contracts on which Boggs also supplied nonconforming parts.  Boggs says this violated Federal Rule of Evidence 404(b)(1), which states that other-acts evidence cannot "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  The government counters, first, that Rule 404(b) is not implicated where the so-called other (uncharged) acts "are direct evidence regarding an ongoing scheme to commit mail fraud," citing *United States v. Weinstock*, 153 F.3d 272, 276-78 (6th Cir. 1998), and second, with respect to the false-claims counts, that this court's three-prong test for the admissibility of other-acts evidence supports the district court's decision.

As an initial matter, the parties disagree over the proper standard by which we should review Boggs's claim.  Generally we review a district court's evidentiary determinations for abuse of discretion, *see General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *United States v. LaVictor*, 848 F.3d 428, 440 (6th Cir. 2017), and Boggs says that standard is applicable here.  However, Boggs did not object at trial to the government's admission of the five additional contracts, so the government urges plain-error review.  We agree with the government.  Boggs didn't even object

to the government's initial plan, discussed at the pretrial status conference, to admit evidence of 21 additional contracts. Instead, when confronted with the government's proposal to admit 21 additional contracts, he conceded that "[t]he government is free to try their case" and complained only about unnecessarily extending the trial. In any event, the district court *agreed* with Boggs that 21 contracts would be excessive and by sheer volume become unduly prejudicial, and limited the additional evidence to five contracts. Boggs never objected to that compromise.

That means plain-error review applies. *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999). Establishing plain error requires a defendant to demonstrate: "(1) error; (2) that was obvious or clear; (3) that affected defendant's substantial rights; and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (internal quotation marks and citation omitted). We find such error "only in exceptional circumstances . . . where the error is so plain that the trial judge . . . was derelict in countenancing it." *Id.* (internal quotation marks and citation and brackets omitted).

We find no error. First, the government is correct regarding the evidence with respect to the mail-fraud counts. The additional contracts are not properly considered "other acts" within Rule 404(b)'s ambit, since each contract reflected the same sorts of nonconformities and false statements at issue in the charged counts, and each contract was performed during the period alleged in the indictment. As such, the five contracts are direct evidence of the alleged scheme to defraud, and the district court correctly instructed the jury that it could "consider this evidence in deciding whether the defendant engaged in a scheme or artifice for the purpose of committing mail fraud as alleged in Counts 1 through 4 of the indictment." Indeed, we have made clear that "Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995). And because the

additional contracts here "were part of [an] ongoing scheme to commit mail fraud," they are not

"other acts" subject to Rule 404(b)'s limitations. *Weinstock*, 153 F.3d at 277.

Second, the district court correctly instructed the jury that it could consider the additional

contracts evidence for the false-claims counts—but only as the contracts related, if at all, to

Boggs's mental state. Evidence of other acts is admissible under Rule 404(b) if (1) there is

"sufficient evidence to show that the defendant committed the other acts"; (2) the evidence "is

admissible for a legitimate purpose"; and (3) the evidence's probative value would not be

"substantially outweigh[ed] by its prejudicial effect." *United States v. Bell*, 516 F.3d 432, 441-44

(6th Cir. 2008). Boggs did not argue in the district court, and does not argue now, that there was

insufficient proof that he was responsible for the additional contracts. That leaves only the last

two *Bell* elements in dispute.

Was the evidence admissible for a legitimate purpose? Plainly, it was. And the district

court's instruction limited the jury's review of the evidence to that legitimate purpose. Rule

404(b)(2) provides that evidence of other bad acts "may be admissible" to prove, among other

things, intent and knowledge. Here, the district court made clear that the jury could

> consider [the additional contract] evidence in relation to the false claim charges in Counts 5 through 25 of the indictment *only as it bears on the defendant's knowledge*—that is, whether the defendant knew the claims were false—and the defendant's *intent*; in other words, whether the defendant acted with the intent to defraud.

R. 85, Tr., PID 727 (emphases added). Furthermore, Boggs's intent—or lack thereof—was a

critical issue in the case; in fact, much of Boggs's defense at trial was predicated on the idea that

he acted in good faith. R. 93, Tr., PID 1699 (stating in closing argument that "he believed what

he was doing was correct"). That explains why the government sought to admit the additional

contract evidence in the first place. R. 88, Tr., PID 772 (anticipating "some effort to try to show

some kind of good-faith defense" and arguing the contracts show "more evidence of an absence of mistake . . . opportunity, intent, plan"). The additional contracts therefore served a legitimate evidentiary purpose.

But was the evidence's probative value substantially outweighed by the danger of unfair prejudice? No. Again, the additional contracts were probative of Boggs's knowledge or intent, since they provided further evidence from which a jury could infer that Boggs improperly claimed compliance with contract requirements. Such evidence, the government argues, "tends to undermine any inference that Boggs's false representations were accidental rather than knowing or intentional." Government's Br. at 49; *see United States v. Frediani*, 790 F.3d 1196, 1202 (11th Cir. 2015) (upholding admission of six additional fraudulent contracts not charged in the indictment, noting that "[t]he government was required to prove intent, and that necessity became all the more important when Frediani implied that he had only made a mistake"). We agree. It is common sense that the more often one does something, the less likely it is done by mistake, and the more likely it is calculated and intentional conduct.

As for the risk of prejudice, the additional contracts did not have "an undue tendency to suggest decision on an improper basis," such as "an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Fed R. Evid. 403, Advisory Committee Notes). The nonconformities and misrepresentations evidenced by the five additional contracts were of the same kind and degree as those in the 25 contracts directly at issue; they were unlikely to nudge the jury toward an emotionally driven decision any more than would the other 25. Nor was the additional evidence so profuse as to become prejudicial. Boggs quotes the district court's comment at the status conference that 404(b) evidence can "become so repetitive that it could potentially become prejudicial or unfair," Boggs's Br. at 40 (citing R. 88, Tr., PID 775), and argues that "the

concerns expressed by the District Court pretrial regarding the other acts evidence manifested at trial," Boggs's Br. at 46. [3] But that argument omits the fact that the district court addressed its "concerns" at the status conference and later at trial, by allowing the government to admit only five of the 21 additional contracts. The district court further protected against any risk that the jury might misuse the additional contracts evidence by carefully instructing it that it could only consider such evidence as it bears on Boggs's intent.

The district court did not err in admitting the five additional contracts.

*Ordering Recesses*. Boggs next argues that the district court committed reversible error when it ordered recesses that Boggs says allowed the government an unfair opportunity to rehabilitate witnesses who were "flounder[ing] and not be[ing] convincing."

A district court's treatment of "the mode and order of examining witnesses and presenting evidence," Fed. R. Evid. 611(a), will ordinarily be overturned only if a "defendant's substantial rights are affected." *United States v. Fields*, 763 F.3d 443, 465 (6th Cir. 2014). And since Boggs

---

[3] Boggs believes his prejudice argument is made stronger by two aspects of the trial. First, he argues that, though the district court only allowed five additional contracts to come in, the numbering of the exhibits suggested to the jury that there were still more nonconforming contracts. Boggs's Br. at 43 (pointing out that exhibits were not numbered 26-30 but instead stretched into the 40s). Boggs contends that because the exhibit-numbering "in effect advised [the jury] there were at least 21 other similarly fraudulent contracts," the "Government's theory obviously [was] that because he was guilty of so many bad contracts, Boggs should be found guilty of those in the indictment." This is wrong for two reasons. One, the argument assumes that the jury inferred that the number of exhibits must equal the number of fraudulent contracts. And two, even if the jury did draw that inference, the jury knew how it was to properly consider any additional contracts evidence with respect to the false-claims counts, i.e., only for purposes of evaluating Boggs's mental state.

Boggs also says the district court's error in admitting the additional evidence was "exacerbated" by the district court's reading of the indictment to the jury, which included the total amount paid on nonconforming contracts from 2010 to2014, as opposed to the amount paid only on the contracts for the charged counts. However, Boggs did not object to the reading of the indictment and a district court is generally "well within its discretion in deciding to read an indictment to the jury." *United States v. Smith*, 419 F.3d 521, 530 (6th Cir. 2005). Further, the total amount paid on contracts in that timeframe was certainly relevant to the mail- fraud counts, which concerned a fraudulent *scheme*, not only the isolated instances in the charged counts. And at any rate, this passing remark to a larger figure (about $80,000 above the charged-counts figure) did not transform the district court's reasonable decision to admit the additional contracts evidence into an unfairly prejudicial one that violated Rule 403.

never objected to the district court's recesses at trial, we apply plain-error review. *See United States v. Damra*, 621 F.3d 474, 496 (6th Cir. 2010).

We see no error, let alone plain error. True, the district court a few times ordered recesses during the government's direct examination of witnesses; true also, those recesses came in the midst of some confusion between the government and its witnesses. But the Federal Rules of Evidence contemplate that district courts will exercise their managerial powers in a manner necessary to "make . . . procedures effective for determining the truth," "avoid wasting time," and "protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a)(1)-(3). The discretion baked into Rule 611 explains why we defer to a district court's trial-management decisions, *Fields*, 763 F.3d at 465, including whether and when to take recesses, *Delaine v. United States*, 605 F. App'x 468, 469-70 (6th Cir. 2015).

So while Boggs argues the district court ordered the recesses to "provide[] assistance" and "essentially took a position on the case and became a third prosecutor," the more likely explanation given the district court's contemporaneous remarks is that the district court felt recesses would clear up unnecessary confusion on complex issues, thereby ensuring the examination was "effective for determining the truth" and "avoid[ing] wasting time," Fed. R. Evid. 611(a)(1)-(2).[4] As such, we cannot say the district court committed an "obvious or clear" error by ordering the recesses. *See Vonner*, 516 F.3d at 386.

---

[4] The parties argue over the applicability of *Delaine v. United States*, an unpublished decision in which we held the district court committed no error by ordering a recess during direct examination by the prosecution. Government's Br. at 55-56; Boggs's Reply Br. at 18-19. While we think *Delaine* offers some support for the government's position, we need not rely on it to justify our reasoning in this case. Here, the district court sensed genuine confusion—confusion that might make the jury's job in an already-complex case more difficult—and ordered recesses to clear up that confusion. That is the district court's prerogative under Rule 611.

*Abuse-of-Trust Enhancement*. In his fourth issue on appeal, Boggs challenges the district court's application of the abuse-of-a-position-of-trust enhancement under United States Sentencing Guidelines § 3B1.3.

In reviewing a district court's sentencing determination, "[t]his court will not set aside a district court's findings of fact . . . unless the findings are clearly erroneous." *United States v. Hamilton*, 263 F.3d 645, 651 (6th Cir. 2001). But "whether those facts . . . warrant the application of a particular guideline provision is purely a legal question and is reviewed *de novo* by this court." *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006).

The district court correctly applied the abuse-of-trust enhancement. The Guidelines provide for a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The Application Notes to § 3B1.3 describe positions of trust as "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." § 3B1.3, Application Note 1. Individuals in these positions "ordinarily are subject to significantly less supervision" than employees exercising non-discretionary duties. *Id.*

The district court, after hearing argument from both the government and Boggs, concluded that Boggs held a position of trust because of his company's placement in the ARP program. R. 83, Tr., PID 603 ("And in this case that is the status that Mr. Boggs earned, and that's the kind of trust the government reposed in him."). Through the ARP program (and the COC program), Boggs's handling of the contracts, invoices, and shipments received little oversight. The very letters authorizing Boggs's participation in the ARP program reminded Boggs that the DOD was placing substantial trust in Boggs's assurances: "I am sure you recognize the significance of the

reliance we are placing on your organization, and, as such, you will continue to assure that a satisfactory Quality Management System is maintained." Thus, there is little question that Boggs occupied a position of trust. The district court also found—and we agree—that Boggs abused that trust. As the district court put it, Boggs's participation in the ARP and COC programs meant that Boggs "received less scrutiny than other contractors, and he took advantage of that absence of scrutiny to provide the government with parts that were nonconforming."

Boggs resists this conclusion in two ways. First, he points out that the ARP only "afforded the Government a choice" of whether to accept delivery without inspection. Because Boggs would not know the government's election in advance, he "still prepared each item for actual physical inspection on the assumption that a Government inspector would inspect the items at his shop." Since Boggs was always ready for the government to inspect his parts, he contends he never abused the government's trust. This argument misses the point. Yes, the government had a choice, but Boggs knew full well that his track-record meant close inspection was far less likely. For every item at issue in this case, the government declined to inspect the part before accepting it, and instead relied on Boggs's assurances that the item conformed to the contract's specifications. The items, of course, did not. But the DOD realized that was true long after their delivery, and only then because an inspector's random selection of "eight to ten" of Boggs's contracts revealed "significant defects." That led to further investigation, which revealed the nonconformities on the 25 contracts at issue here.

Boggs's second argument is also a non-starter. He says the abuse-of-trust enhancement cannot be applied to companies, like his, that remained subject to scrutiny despite their trusted status. He contends that all of the cases relied on by the government are inapplicable here, because in those cases the defendants, unlike Boggs, were subjected to "little or no oversight." But our

review of the case law reveals no material difference between Boggs's situation and the government's cited cases. Though outside this circuit, the Fourth Circuit's decision in *United States v. Glymph*, 96 F.3d 722 (4th Cir. 1996), is instructive. There, as here, the defendant participated in the ARP program and was "trusted to self-certify its compliance" with DOD specifications, but instead "sen[t] nonconforming shipments while knowing that it was unlikely that the disparities would be caught." *Id.* at 728. In both *Glymph* and in this case, the DOD never relinquished its right to inspect the parts; it was just less likely that it would exercise its inspection authority given its trust in the contractors. Nor is *Glymph* distinguishable because the parts Boggs produced "were open and available for inspection at any time." Boggs's Br. at 21. It is not as if the defendant in *Glymph* could have denied the DOD the right to inspect the items it provided on DOD contracts; in fact, Glymph's attempt to evade DOD inspection requirements caused the DOD to expel Glymph's company from the ARP program altogether. 96 F.3d at 724.

But even if Boggs's imagined distinction were real, i.e., even if prior abuse-of-trust cases involved significantly *more* trust or significantly *less* supervision, it would not make a difference in this case. The key fact here is that Boggs's participation in the ARP program meant the government accorded him a special trust accompanied by less supervision. That the DOD retained the right to inspect the items Boggs provided, and that Boggs was prepared for that possibility, does not mean he did not occupy a position of trust vis-à-vis the DOD.

We therefore conclude that the district court correctly applied the abuse-of-trust enhancement.

*Restitution.* In Boggs's final attack, he challenges the district court's restitution award. The district court ordered restitution in the amount of $279,650.20, based on the 46 contracts where Boggs supplied non-conforming parts. Boggs argues that the district court erred by basing its

restitution calculation on the amount the government paid on 46 contracts, rather than only on the 25 contracts charged in the indictment.

We ordinarily review restitution determinations for abuse of discretion. *See United States v. Elson*, 577 F.3d 713, 725 (6th Cir. 2009). But because Boggs did not object to the restitution calculation at sentencing, we examine for plain error. *See United States v. Freeman*, 640 F.3d 180, 186 (6th Cir. 2011).

The loss resulting from the 25 charged counts totaled $112,468.59. Boggs is right that the district court's restitution award was calculated according to the amount paid on 46 contracts—only 25 of which were the focus of the charges in the indictment. But he is wrong that this requires a do-over. Boggs urges a bright-line rule that carries a certain intuitive appeal: a restitution award cannot be premised on anything other than conduct for which the defendant was convicted. And because Boggs was convicted on the basis of 25 nonconforming contracts, the restitution amount must therefore be limited to the value of those contracts.

The problem for Boggs, however, is that federal law dictates otherwise. The Mandatory Victims Restitution Act (MVRA) provides that where an offense "involves as an element a scheme," restitution should be ordered for "any person directly harmed by the defendant's criminal conduct in the course of the scheme." 18 U.S.C. § 3663(a)(2). Mail fraud "involves as an element a scheme"; indeed, as the jury was properly instructed, to convict Boggs for mail fraud, the government had to prove that he "knowingly and intentionally devised . . . a scheme or artifice to defraud." Accordingly, when we have applied the MVRA "[i]n the context of mail fraud convictions, we have read this statutory definition of 'victim' to allow for restitution for the loss attributable to all the victims of a defendant's scheme to defraud, *even when the defendant was not*

*indicted or convicted of fraud with respect to each victim.*"  *United States v. Jones*, 641 F.3d 706, 714 (6th Cir. 2011) (emphasis added).[5]

In *United States v. Winans*, to take one notable example, we determined that a restitution order for 612 victims of wire fraud was justified under the MVRA even though the defendant pleaded guilty to one count involving just two victims.  748 F.3d 268, 272–73 (6th Cir. 2014).  In another case, *United States v. Churn*, we held that a defendant convicted on seven counts of bank fraud could be ordered to pay a restitution amount more than double "the amount of harm linked to his convicted counts."  800 F.3d 768, 781–82 (6th Cir. 2015).  These cases offer strong support for the district court's restitution award here.

To be sure, the rule that uncharged conduct can be considered in calculating restitution comes with two critical limitations applicable to this case.  First, a district court can award restitution greater than the losses in charged counts "only when the loss is attributable to the precise scheme that was an element of the defendant's convicted offense."  *Jones*, 641 F.3d at 714.  And second, "the scope of the scheme is defined by the indictment for purposes of restitution."  *Id.*  But the district court's restitution calculation here violated neither of those tenets.  The 21 additional contracts were part of the "precise scheme" that undergirded the four charged mail-fraud counts. The additional contracts were from the same time period as the contracts involved in the charged counts and involved the same types of nonconformities.  Moreover, the superseding indictment made clear that the scope of the scheme stretched beyond the charged contracts.  Specifically, the indictment alleged that Boggs's scheme spanned from April 2010 through January 2014; that Boggs provided nonconforming parts on the contracts "listed in this Superseding Indictment and

---

[5]     While the MVRA and *Jones* speak in terms of compensating more victims than those named in the indictment, logic dictates that the greater includes the lesser: if individuals not even named in the indictment can be compensated via restitutions awards, surely victims named in the indictment can be fully compensated for all their losses, regardless whether those losses were directly at issue in the indictment or conviction.

on dozens of additional contracts"; and that the "total amount" paid to Boggs "[d]uring the 2010 to 2014 time frame" was $184,862.40, which figure included the amount paid on the 21 additional contracts. The superseding indictment also states that the Defense Logistics Agency, a DOD agency, "incurred an additional loss of $47,043.33 for the cost involved with testing the non-conforming parts. Lastly, the DOD is required to re-bid all of the non-conforming parts supplied by the defendants at a specific cost. The specific cost to the DOD is $47,748." The restitution awarded was for the $184,862 and the two $47,000-plus figures.

In the end, even Boggs acknowledges that *Jones* justifies an award for conduct that was neither "indicted or convicted." But rather than seriously attempt to work around this rule, he tries some rhetorical sleight of hand. Boggs contends that since *Jones* limits the amount of restitution to "the loss . . . attributable to the *precise scheme*" the defendant carried out, *Jones*, 641 F.3d at 714 (emphasis added), the "loss attributable to Boggs should be limited to the *precise counts* for which he was found guilty," Boggs's Br. at 55 (emphasis added). But replacing *Jones*'s use of "scheme" with the word "counts" doesn't work. The *counts* on which Boggs was convicted were episodes in a larger *scheme*. The district court therefore correctly based its restitution order on the scope of that scheme.

We see no error, much less plain error, in the district court's restitution award.

**III**

For the reasons set forth above, we **AFFIRM**.